T.C. Memo. 1996-304

UNITED STATES TAX COURT

ZAHIRUDEEN PREMJI AND CAROL M. PREMJI, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

CARL JOHN NORBY, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 8372-94, 10353-94.          Filed July 3, 1996.

<u>Declan J. O'Donnell</u>, for petitioners.

<u>Virginia L. Hamilton</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, <u>Judge</u>:  In these consolidated cases respondent determined the following deficiencies in petitioners' Federal income taxes:

| Petitioners | Docket No. | Year | Deficiency |
|---|---|---|---|
| Zahirudeen and Carol M. Premji | 8372-94 | 1990 | $ 18,501 |
| Carl John Norby | 10353-94 | 1990 | $ 15,959 |

In an Amendment to Answer filed in docket No. 8372-94 respondent asserted an increased deficiency of $4,448 based on the allegation that petitioners Premji failed to report interest income of $29,329 actually or constructively received in 1990. Petitioners and respondent have made concessions with respect to the amount of the interest income received by the Premjis, and those concessions should be reflected in the computations for entry of the decision.

The primary issue in both of these cases is whether petitioners Premji and Norby are entitled to theft loss deductions in 1990 resulting from their investment of funds with M&L Business Machine Company, Inc., which, through its officers and shareholders, operated a ponzi scheme. The resolution of this issue depends on whether there existed a reasonable prospect of recovery in that year.

Secondary issues in the Premji case are whether petitioners constructively received certain amounts of interest income in 1990 and whether certain amounts of interest actually received in 1990 constitute taxable income to them in that year.

Unless otherwise stated, all section references herein are to the Internal Revenue Code in effect for 1990, and all rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference.

At the time they filed their petitions in these cases, Zahirudeen Premji (Mr. Premji), and Carol M. Premji, and Carl John Norby (Mr. Norby), resided in Boulder, Colorado.

Mr. Premji and Mr. Norby invested funds in M&L Business Machine Company, Inc. (M&L).

M&L Business Machine Company, Inc.

M&L was a closely held Colorado corporation formed in the 1970's to repair office machines and business equipment. During the 1980's, Robert Joseph, Daniel Hatch, and David Parrish acquired all of M&L's stock. Thereafter, M&L was used to operate a ponzi scheme.[1] M&L also continued to repair office machines and business equipment, but that activity generated little income.

The M&L ponzi scheme collected funds from investors. In return, M&L promised investors exceptionally high interest rates.

_____

[1] The first ponzi scheme surfaced in 1920, instigated by Charles Ponzi. It is the subject of Cunningham v. Brown, 265 U.S. 1 (1924).

Investors were told that the funds were used to purchase business equipment for resale. No equipment was purchased. Instead, funds obtained from later investors were used to pay early investors their promised interest rates. Later investors often received no payments.

All of M&L's equipment, inventory, accounts, chattel paper, and general intangibles were subject to a security agreement, dated September 11, 1989, in favor of Capitol Federal Savings and Loan (Capitol Federal). Subsequently, when the Resolution Trust Corporation (RTC) was appointed Capitol Federal's receiver, RTC succeeded to Capitol Federal's security interest.

On October 1, 1990, M&L filed a petition with the United States Bankruptcy Court for the District of Colorado under Chapter 7 of the Bankruptcy Code. 11 U.S.C sec. 701 (1994). The Chapter 7 filing was due to a clerical error, and the case was converted to a Chapter 11 proceeding on October 9, 1990. 11 U.S.C. sec. 1101 (1994).

M&L notified private investors by letter dated October 4, 1990, that it had filed the bankruptcy petition ostensibly to prevent RTC from seizing the assets covered by the September 1989 security interest. M&L sent private investors a second letter dated October 30, 1990, purporting to inform them as to M&L's status and indicating that M&L would shortly obtain a loan from a European lender, Manns Haggerskjold, which would enable M&L to remove itself from the Chapter 11 bankruptcy proceeding. In

fact, there was no loan commitment from Manns Haggerskjold. Both letters contained additional false representations, notably that M&L's assets exceeded liabilities.

M&L filed original bankruptcy schedules on October 25, 1990, and an amendment on November 15, 1990. Both the original schedules and the amendment falsely showed that assets exceeded liabilities.[2]

At some point not specified in the record, the Colorado Division of Securities began to investigate M&L's operations. As a result of its investigation, on December 3, 1990, the Colorado Securities Commissioner filed an ex parte motion to oust M&L as debtor in possession and to have a trustee appointed.[3] In support of the ex parte motion, the Securities Commissioner alleged the following: (1) M&L executed a security interest in

---

[2] M&L's Oct. 25, 1990, bankruptcy schedules listed assets in the amount of $29,865,909 and liabilities in the amount of $5,505,875. These schedules also state that M&L had promissory note obligations to numerous private investors that were not listed due to claimed lack of information. The Nov. 15, 1990, amendment lists assets in the amount of $29,865,909 and liabilities in the amount of $15,251,956. This amendment also indicates an additional amount of unsecured claims in an unknown amount.

On Feb. 1, 1991, M&L filed another amendment to its bankruptcy schedules. This amendment also falsely showed assets in excess of liabilities. In July or August 1991, Christine J. Jobin, the bankruptcy trustee, filed a further amendment adding unsecured creditors.

[3] The Securities Commissioner's motion was captioned Motion for Ex Parte Order Allowing Appointment of Trustee, or for Expedited Hearing.

the same assets to more than one creditor; (2) M&L gave its bookkeeper false information regarding payees of M&L checks; (3) M&L falsely claimed that its books and records had been audited by a certified public accountant named Jonathan Williams;[4] and (4) M&L falsely claimed to have obtained a $15 million loan commitment from Manns Haggerskjold. The Securities Commissioner concluded that M&L's conduct was "replete with facts indicating fraud, dishonesty, incompetence, and gross mismanagement of its affairs, all to the detriment of the estate creditors and past, present, and future investors". The Securities Commissioner concluded that this conduct would continue to the detriment of creditors' interests. The Securities Commissioner's ex parte motion was made part of the bankruptcy file.

On December 10, 1990, RTC joined the Securities Commissioner's ex parte motion and further alleged that M&L's conduct demonstrated its pattern of defrauding everyone who crossed its financial path, including the Bankruptcy Court.[5] RTC's motion was made part of the bankruptcy file.

On December 18, 1990, the Bankruptcy Court granted the Securities Commissioner's motion and Christine J. Jobin (Ms.

---

[4] By affidavit attached to the Securities Commissioner's ex parte motion and made part of the record in this proceeding, Jonathan Williams expressly denied any participation in the preparation of M&L audit reports.

[5] RTC's motion is captioned Joinder by RTC in Motion for Ex Parte Order Allowing Appointment of Trustee.

Jobin), was appointed as Chapter 11 trustee. Ms. Jobin is an attorney who has dealt with bankruptcy matters for 13 years.

On or about December 18, 1990, Ms. Jobin met with members of the Colorado Division of Securities and was informed of M&L's alleged fraud and misconduct. She also received a copy of M&L's bank records for late 1989 and 1990. In 1990, after reviewing M&L's bank records, Ms. Jobin believed that M&L was operating a check-kiting scheme.

Ms. Jobin also met with Robert Joseph, M&L's president, on or about December 18, 1990. Ms. Jobin thought that Mr. Joseph was not telling her the truth and that the Securities Commissioner's fraud and misconduct allegations were accurate. She also discovered that Mr. Joseph could not document M&L receivables claimed to be $13 million to $15 million.

Between December 18, 1990, and February 2, 1991, Ms. Jobin's suspicions as to the legitimacy of M&L's operations increased and she continued to investigate its affairs. During that time period, she received some information that M&L's inventory of computers might be paving bricks packaged to resemble computers. However, at the end of 1990, Ms. Jobin was hopeful that M&L's unsecured creditors would recover something from the bankruptcy estate.

On February 2, 1991, Ms. Jobin personally went to M&L's warehouse and opened a box that was to have contained computer inventory. She found that the box contained only paving bricks

covered with hardened foam and dirt.  She then concluded that M&L was a ponzi scheme and that it had no inventory assets from which creditors' claims could be satisfied.  On February 4, 1991, she halted the ponzi scheme.

Ms. Jobin continued to operate M&L's business machine repair service in the hope of generating assets for creditors.  It did not perform as she hoped, and she ceased its operation in March 1991.

When Ms. Jobin discovered that M&L had no inventory in February 1991, she believed that the only recovery for M&L creditors would be through adversary proceedings based on the legal theories of preferential transfers or fraudulent conveyances.  See 11 U.S.C. secs. 547 and 548 (1994).  M&L's assets were then valued at less than $100,000 and were encumbered by RTC's security interest.

On September 26, 1991, M&L's bankruptcy case was converted to Chapter 7.

Approximately 1,600 investors were involved in M&L's ponzi scheme.  Ms. Jobin estimated that about 540 of these investors received promised interest payments.  In September 1992, she began filing adversary proceedings against some of these 540

investors to recover assets.[6]  She filed additional proceedings in September 1993.

At the time Ms. Jobin filed the adversary proceedings against M&L's investors in 1992, there was little case law on point within the jurisdiction of the United States Court of Appeals for the 10th Circuit.  Nonetheless, by June 1995, she had collected approximately $8.5 million for the bankruptcy estate. She anticipated collecting a total of $14 million at the conclusion of all proceedings.  Ms. Jobin estimated that unsecured creditors would recover approximately 30 percent of their claims and that distributions to unsecured creditors would probably be made by the end of 1996.

Petitioners Zahirudeen and Carol M. Premji

The Premjis are husband and wife who filed a joint Federal income tax return for the year 1990 on which they reported a theft loss of $58,000 from their investment in M&L.

Mr. Premji has a degree in mechanical engineering and is a systems engineer.  He is not an accountant or financial analyst.

Mr. Premji learned about M&L from Scott Brayer, a friend of a neighbor.  He knew that Mr. Brayer had invested in M&L for several years and thought his lifestyle supported his claimed M&L earnings.  Several other individuals, including Karen Marx and

---

[6]  Ms. Jobin was delayed in filing these proceedings because M&L's records had been removed from its offices.  The records were recovered pursuant to a search warrant and made available to her in July 1992.

Tom Bird, also appeared to Mr. Premji to have made considerable sums from their investments in M&L over a long period of time.

In July or August of 1990, Mr. Premji reviewed a book that Mr. Brayer gave him explaining M&L's programs, finances, and the equipment M&L claimed to sell. Mr. Brayer told him that M&L was soliciting investors to finance its purchase of used fax machines for resale to a private company in Russia. Mr. Premji understood he could obtain a 10 percent return every 8 days (456 percent annually) if he invested in M&L. He did not speak with a representative of M&L.

Based on newspaper reports of returns on real estate transactions in Central City, Colorado, and on his experiences growing up in Tanzania, Africa, Mr. Premji thought there were legitimate ways for an investor to receive an annual return of 456 percent. He concluded that an investment in M&L would be a reasonable investment. Therefore, he invested a total of $58,000 in M&L as follows:

| Date | Amount |
|------|--------|
| July 31, 1990 | $20,000 |
| August 30, 1990 | 4,000 |
| September 5, 1990 | 14,000 |
| September 13, 1990 | 20,000 |
| | $58,000 |

He gave Mr. Brayer cashier's checks for the amounts listed above and Mr. Brayer delivered them to M&L.

During August 1990, Mr. Premji received four checks from M&L in the amount of $2,000 each that represented promised interest

payments.  The checks were dated August 6, August 14, August 22, and August 30, 1990, and were drawn on M&L's account with the Bank of Boulder.  Each time he received an interest check, Mr. Premji also received a $20,000 check representing his current principal balance.

Mr. Premji cashed the four $2,000 checks at the Bank of Boulder in August 1990.  He did not report the $8,000 as interest income received for that year.  He did not cash the $20,000 checks.  Instead, he returned them to M&L.

On two occasions Bank of Boulder personnel refused to cash the checks because they were postdated.  Mr. Premji was told to return in a day or two.  He did so and was able to cash the checks.

Mr. Premji received six additional checks from M&L as follows:

| Check Number | Amount | Date Issued |
|---|---|---|
| 100416 | $64,440 | 9/23/90 |
| 100417 | 6,444 | 9/23/90 |
| 94062 | 70,884 | 10/1/90 |
| 94063 | 7,088 | 10/1/90 |
| 96092 | 77,972 | 10/9/90 |
| 96093 | 7,797 | 10/9/90 |

The checks for $64,440, $70,884, and $77,972 represented Mr. Premji's total principal advanced to M&L as of the date of the check.  The checks for $6,444, $7,088, and $7,797 represented his ten percent interest on that principal as of the date of each check.

Mr. Premji did not obtain cash for any of the above-listed checks. He voluntarily returned the September 23 and October 1, 1990, principal and interest checks to M&L to maintain and increase his investment.[7] He attempted to cash the October 9, 1990, principal and interest checks after he learned that M&L had filed its bankruptcy petition. He was unable to do so.

Mr. Premji did not report the $6,444 and $7,088 checks as interest income on his 1990 Federal income tax return.

Mr. Premji learned of M&L's bankruptcy filing on October 5, 1990, from Mr. Brayer. His remarks as to the status of investors' funds struck Mr. Premji as "sketchy", and he understood that it would be some time before the payments would resume, if at all. Mr. Premji did not consult an attorney, accountant, or financial analyst in 1990 after he learned that M&L had filed the bankruptcy petition.

Mr. Premji met with Karen Marx, another M&L investor, on or about October 9, 1990, but he did not state the content of their conversation.

In 1990, Mr. Premji attempted to review M&L's bankruptcy file but was unable to do so. He attended the first meeting of M&L creditors held on or about November 30, 1990. There is no

---

[7] By returning the larger checks representing his total investment Mr. Premji chose not to liquidate the investment. By returning the smaller checks, he increased the total principal advanced to M&L.

evidence of the substance of the meeting.  He did not speak with Ms. Jobin, the bankruptcy trustee.

Based on M&L's October 1990 letters, his conversations with Mr. Brayer and Karen Marx, and his attendance at the November creditors' meeting, Mr. Premji concluded that M&L's investment materials he had reviewed in August 1990 were not accurate.  He questioned why M&L was having difficulty securing financing if its net worth was as claimed.  He interpreted the October 1990 letters as nothing more than excuses for why money was not available and an attempt by M&L to cover its tracks.  Consequently, he believed that the funds he had invested with M&L would not be repaid.

Mr. Premji consulted an attorney in late February 1991.  He was told that a suit against the Bank of Boulder (Amazing Enterprises suit) was planned and that several other possibilities for investor recovery were being considered.  Shortly thereafter, in March 1991, he signed a retainer agreement with the attorney's firm.  As a result, Mr. Premji was one of the 68 Amazing Enterprises suit plaintiffs seeking to recover losses from their M&L investments.  The Amazing Enterprises suit was commenced on or about July 1, 1991.  It was settled in January 1993.  Mr. Premji received $29,205 in settlement of his claim in late 1994.  His legal fees and costs associated with the suit were $9,772.

Mr. Premji filed his 1990 Federal income tax return on April 15, 1991. Prior thereto, Mr. Premji knew of his forthcoming involvement in the Amazing Enterprises lawsuit.

Mr. Premji filed a proof of claim in the M&L bankruptcy proceeding on May 16, 1991.

In the notice of deficiency dated February 16, 1994, respondent disallowed Mr. Premji's claimed theft loss of $58,000 on the ground that no deductible loss was sustained in 1990.

Petitioner Carl John Norby

Mr. Norby has a degree in mechanical engineering. He was employed by IBM developing business machines until his retirement a few years ago. He is not an accountant or financial analyst.

Mr. Norby invested in M&L to increase his retirement income. Celetha Reyos, one of M&L's sales representatives, gave him M&L's financial statements, history, resumes of the three principals, and a description of investment programs in August 1990. After reviewing the information, Mr. Norby and an IBM co-worker, Larry E. Rittenhouse, met with Dale Krug, M&L's vice-president, on September 20, 1990. Mr. Krug showed Mr. Norby and Mr. Rittenhouse M&L's 1988 and 1989 financial statements and a partial financial statement for 1990. Mr. Norby asked various questions about M&L's operations, including how M&L was able to pay investors the promised high rates of return and whether the company had any problems. Based on the financial statements and Mr. Krug's responses to his questions, Mr. Norby invested $50,000

in M&L on September 20, 1990.  He received a promissory note stating that his interest would be $3,500 per month for 12 months (84 percent per year).

On October 2, 1990, Mr. Norby again met with Mr. Krug and asked additional questions about M&L's operations.  He did not know and Mr. Krug did not tell him that the M&L bankruptcy petition had been filed on October 1, 1990.  Mr. Norby was satisfied with Mr. Krug's replies that M&L was doing fine and invested an additional $10,000 on October 2, 1990.  He received a second promissory note stating that his interest would be $700 per month for 12 months (84 percent per year).

On October 11, 1990, Ms. Reyos told Mr. Norby that M&L had filed the bankruptcy petition.  He did not receive M&L's October 4, 1990, letter and did not know about it until he received the October 30, 1990, letter.  In view of his October 2, 1991, conversation with Mr. Krug, Mr. Norby thought both letters looked suspicious.

Mr. Norby spoke with Ms. Reyos approximately once a week during the remainder of 1990 in an attempt to determine what M&L's intentions were regarding its investors.  He also spoke with Mr. Joseph, M&L's president, several times during 1990 after he learned that M&L had filed for bankruptcy.  He did not find the information he obtained from these conversations to be positive.

On or about December 27, 1990, Mr. Norby, accompanied by Mr. Rittenhouse, reviewed M&L's bankruptcy file. He did so because he anticipated claiming a theft loss for his M&L investment on his 1990 Federal income tax return, and he wanted to obtain documentation to support his claim.

Mr. Norby read and believed that the fraud allegations made by the Colorado Securities Commissioner and RTC were true. He discovered that the Manns Haggerskjold loan commitment M&L professed to have secured in its October 30, 1990, letter to investors did not exist. He also reviewed the bankruptcy schedules. Because of Mr. Krug's failure to tell him about M&L's bankruptcy petition on October 2, 1990, and based on his understanding of the contents of the bankruptcy file, Mr. Norby did not believe M&L's assets exceeded liabilities. He concluded that his investment would not be repaid.

Mr. Norby also learned from the bankruptcy file that Ms. Jobin had been appointed trustee, but he did not contact her. He received two creditor's notices from Ms. Jobin and filed a proof of claim in the bankruptcy proceeding on November 5, 1991. He did not file a claim in 1990 because he did not believe that there would be assets remaining after secured creditors' claims were satisfied. He did not contact an attorney in 1990 or in 1991. He was not involved in collateral suits to recover his M&L investment.

Mr. Norby sustained a loss in connection with his placement of funds with M&L.

In the notice of deficiency dated March 15, 1994, respondent disallowed Mr. Norby's claimed theft loss of $60,000 on the ground that no deductible loss was sustained in 1990.

OPINION

1. Claimed Theft Loss Deductions in 1990

The parties agree that Mr. Premji and Mr. Norby sustained theft losses.[8] Sec. 165(a) and (e). They also agree that Mr. Premji and Mr. Norby incurred losses in transactions entered into for profit. Hence, section 165(c)(2) controls the reporting of their theft losses. The dispute is whether deductible theft losses were sustained in 1990.

Petitioners have the burden of proving that they are entitled to the deductions claimed. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). This includes the burden of proving that a deductible loss occurred in the year claimed. See Burnet v. Houston, 283 U.S. 223, 227 (1931); Citron v. Commissioner, 97 T.C. 200, 207 (1991).

The appropriate year for a loss deduction is the year in which the loss is sustained. Sec. 165(a); sec. 1.165-1(d)(1),

---

[8]    See Muncie v. Commissioner, 18 T.C. 849,851 (1952) (whether a theft occurred depends on the law of the jurisdiction where the loss was sustained); see also Edwards v. Bromberg, 232 F.2d 107 (5th Cir. 1956). The applicable provisions of the Colorado theft statute are sections 18-4-401 and 18-4-403, Colo. Rev. Stat. (1986 and 1995 Supp.).

Income Tax Regs. A theft loss is sustained during the taxable year in which the taxpayer discovers the loss. Sec. 165(e); Sec. 1.165-1(d)(3), 1.165-8(a)(2), Income Tax Regs. The loss is not deductible for the year in which the theft actually occurs unless that is also the year in which the taxpayer discovers the loss. Sec. 1.165-8(a)(2), Income Tax Regs.; see <u>Alison v. United States</u>, 344 U.S. 167, 170 (1952); <u>Marine v. Commissioner</u>, 92 T.C. 958, 976 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); <u>Ramsay Scarlett & Co. v. Commissioner</u>, 61 T.C. 795, 808 (1974), affd. 521 F.2d 786 (4th Cir. 1975).

However, if in the year the taxpayer discovers the loss there is a claim for reimbursement for which there is a reasonable prospect of recovery, "no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received". Sec. 1.165-1(d)(3), Income Tax Regs.

It is clear that the loss must be actual and sustained in fact. <u>Boehm v. Commissioner</u>, 326 U.S. 287, 291-292 (1945); <u>Ismert-Hincke Milling Co. v. United States</u>, 246 F.2d 754, 757 (10th Cir. 1957); <u>Lapin v. Commissioner</u>, T.C. Memo. 1990-343, affd. without published opinion 956 F.2d 1167 (9th Cir. 1992); sec. 1.165-1(b), Income Tax Regs.

The requirement that the taxpayer's right of recovery be considered demonstrates that a theft loss must be evidenced by a closed and completed transaction. See Marine v. Commissioner, supra at 980; Ramsay Scarlett & Co. v. Commissioner, supra at 810-811; secs. 1.165-1(d)(1), 1.165-8(a)(2), Income Tax Regs.

Whether there is a reasonable prospect of recovery is a question of fact, determined by examining all facts and circumstances. Sec. 1.165-1(d)(2)(i), Income Tax Regs.; see Boehm v. Commissioner, supra at 292-293 (1945); Dawn v. Commissioner, 675 F.2d 1077, 1078 (9th Cir. 1982), affg. T.C. Memo. 1979-479; Ramsay Scarlett & Co. v. Commissioner, supra at 811-812.

A reasonable prospect of recovery exists when the taxpayer has a bona fide claim for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in the taxpayer's favor. Ramsay Scarlett & Co. v. Commissioner, supra at 811 (citations omitted). The taxpayer is not, however, required to be an "incorrigible optimist", and claims with only remote or nebulous potential for success will not postpone the deduction. United States v. White Dental Manufacturing Co., 274 U.S. 398, 403 (1927); Ramsay Scarlett & Co. v. Commissioner, supra at 811. Thus, the deduction need not be postponed where the financial condition of the party against whom the claim is filed is such that no recovery could be expected. Jeppsen v. Commissioner, T.C. Memo.

1995-342; see also <u>Jensen v. Commissioner</u>, T.C. Memo. 1993-393, affd. without published opinion 72 F.3d 135 (9th Cir. 1995).

The standard to be applied is primarily objective, but the taxpayer's subjective attitude and beliefs are not to be ignored. <u>Boehm v. Commissioner</u>, <u>supra</u> at 292-293; <u>Ramsay Scarlett & Co. v. Commissioner</u>, <u>supra</u> at 812. The standard is to be applied with foresight. <u>Ramsay Scarlett & Co. v. Commissioner</u>, <u>supra</u> at 811.

One of the relevant factors is whether the taxpayer has filed a lawsuit to recoup the loss. <u>Dawn v. Commissioner</u>, <u>supra</u> at 1078; <u>Scofield's Estate v. Commissioner</u>, 266 F.2d 154, 159 (6th Cir. 1959), affg. in part and revg. in part 25 T.C. 774 (1956). Filing the lawsuit soon after the end of the tax year in which the loss was claimed suggests that the taxpayer did not consider the loss a closed and completed transaction. <u>Dawn v. Commissioner</u>, <u>supra</u> at 1078; see also <u>National Home Products, Inc. v. Commissioner</u>, 71 T.C. 501, 525-526 (1979).

Unless litigation is speculative or without merit, where the taxpayer deems the chance of recovery sufficiently probable to warrant bringing a lawsuit and pursuing it with reasonable diligence to a conclusion, the taxpayer should postpone the loss deduction until the litigation is terminated. <u>Scofield's Estate v. Commissioner</u>, <u>supra</u> at 159; see also <u>Gale v. Commissioner</u>, 41 T.C. 269, 276 (1963).

Another fact which we may consider is whether the taxpayer ultimately recovered as a result of a lawsuit. <u>Gale v.</u>

Commissioner, supra at 276; Huey v. Commissioner, T.C. Memo. 1985-348.

However, filing a proof of claim in a bankruptcy proceeding has been held to be a ministerial act that does not require the same degree of effort as pursuing a lawsuit. Jensen v. Commissioner, supra.

The burden is on the taxpayer to show there was no reasonable prospect of recovery in the year the theft loss is claimed. Gale v. Commissioner, supra at 276.

For the reasons stated below, we hold that neither Mr. Premji nor Mr. Norby sustained a deductible theft loss in 1990.

Both Mr. Premji and Mr. Norby contend that their theft losses were discovered in 1990. To the contrary, respondent contends that the losses were not discovered until 1991 when Ms. Jobin, the trustee in bankruptcy, first ascertained that M&L was operating an illegal ponzi scheme and that its inventory did not exist. Regardless of the year in which the theft losses were discovered, the crucial issue here, as we see it, is whether petitioners had a reasonable prospect of recovery in 1990 when they claimed the theft loss deductions. Based on the evidence presented, we conclude that there was a reasonable prospect in 1990 that petitioners would subsequently recover some of their losses.

Several facts support our conclusion. First, Ms. Jobin, the trustee in bankruptcy, testified that she was "hopeful" in 1990

that she would be able to recover the investors' principal from either the assets or the operations of M&L, which was then in a Chapter 11 corporate reorganization proceeding.

Second, when Ms. Jobin discovered the ponzi scheme, she saw other avenues for recovering assets for the bankruptcy estate. Those avenues indeed proved fruitful. In particular, Ms. Jobin instituted adversary proceedings against certain recipients of M&L transfers on the basis of preferential transfers and fraudulent conveyances. These proceedings were not filed until September 1992, because the trustee encountered difficulties in obtaining data pertaining to the transfers and conveyances from M&L. As a result of these suits, the trustee had already recovered $8.5 million for the M&L bankruptcy estate by the time the instant cases were tried, and she estimated that approximately $14 million will eventually be recovered. She also estimated that the total recovery will result in the general unsecured creditors, including petitioners, receiving about one third of their M&L losses, probably sometime in late 1996.

Although at the end of 1990 none of the relevant information for bringing the adversary proceedings had been obtained, this is not the issue for Federal income tax purposes. The facts and events which formed the bases of these adversary suits and upon which the recovery could be based under Federal and State law existed at the end of 1990. Therefore, the existence of such

claims precludes the allowance in 1990 of petitioners' deductions for Federal income tax purposes with respect to their M&L losses.

Mr. Premji argues that case law as to some issues raised by Ms. Jobin in the adversary proceedings was unsettled within the jurisdiction of the Court of Appeals for the 10th Circuit. We disagree. The law was not so uncertain as to render the prospects of success remote or nebulous or to presume that no actual recovery could be expected. Various other courts had decided similar issues. See Cunningham v. Brown, 265 U.S. 1 (1924); In re United Energy Corp., 944 F.2d 589 (9th Cir. 1991); In re Agricultural Research & Technology Group, Inc., 916 F.2d 528 (9th Cir. 1990); First Federal of Michigan v. Barrow, 878 F.2d 912 (6th Cir. 1989); In re Bullion Reserve of North America, 836 F.2d 1214 (9th Cir. 1988); Conroy v. Shott, 363 F.2d 90 (6th Cir. 1966); Eby v. Ashley, 1 F.2d 971 (4th Cir. 1924); In re Baker & Getty Financial Services, Inc., 98 Bankr. 300 (Bankr. N.D. Ohio 1989), affd. 974 F.2d 712 (6th Cir. 1992); In re Independent Clearinghouse Co., 77 Bankr. 843 (D. Utah 1987). Moreover, the trustee has been successful in the adversary proceedings.

Mr. Premji's prospect of recovering some of his losses is even stronger than that of Mr. Norby. Mr. Premji was one of 68 plaintiffs in the Amazing Enterprises lawsuit against the Bank of

Boulder.  Although the lawsuit was filed in July 1991, the facts that formed the basis of that suit existed in 1990.[9]

The success of the lawsuit may have depended on further investigation, but that does not negate Mr. Premji's prospects of recovery in 1990.  The test is whether the taxpayer had a reasonable prospect of recovery at the end of the taxable year in which the loss is claimed, not whether the taxpayer had collected enough information to successfully prosecute legal action. Qureshi v. Commissioner, T.C. Memo. 1987-153, affd. without published opinion 843 F.2d 1388 (4th Cir. 1988); see also Geisler v. Commissioner, T.C. Memo. 1988-404, affd. without published opinion 955 F.2d 47 (9th Cir. 1992).

Mr. Premji discussed the Amazing Enterprises suit and several other possibilities for investor recovery with an attorney in late February 1991.  He chose to pursue those avenues of recovery and signed the attorney's retainer agreement in March 1991.  That he was willing to diligently pursue the lawsuit indicates that his prospects of recovery were reasonable rather than remote or nebulous.  Mr. Premji embarked on his course to recoup his investment before he filed his 1990 Federal income tax return on April 15, 1991.  Hence, before he claimed his theft

---

[9] A copy of the Amazing Enterprises suit complaint was made part of the record.  The suit was based on the Bank of Boulder's alleged improper conduct in dealing with M&L's investors and in handling checks presented for payment during the operation of the ponzi scheme.

loss, he was pursuing at least one avenue of recovering that loss.

The Amazing Enterprises suit, commenced on or about July 1, 1991, was settled in January 1993. In late 1994, Mr. Premji received $29,205 from the settlement. That is approximately 50 percent of his claimed theft loss.

In addition, Mr. Premji filed a proof of claim in the bankruptcy proceeding on May 16, 1991. The sole bankruptcy estate assets available to satisfy creditors' claims are moneys obtained as a result of Ms. Jobin's adversary proceedings to avoid preferences and fraudulent conveyances. Ms. Jobin testified that she concluded in February 1991 that such proceedings would be her only avenue to satisfy creditors' claims. Hence, in early 1991 Ms. Jobin clearly had formulated a plan to attempt to bring assets into the bankruptcy estate.

Even though Ms. Jobin did not begin to file the adversary proceedings until September 1992,[10] the facts that formed the basis of those proceedings existed at the close of 1990, i.e., M&L had made the payments in 1990 that Ms. Jobin sought to avoid.

As to Mr. Norby's prospects of recovery, we have considered his subjective beliefs. His actions are consistent with those beliefs. But, despite the prospect of losing his $60,000

[10] Ms. Jobin did not obtain access to M&L's records until July 1992. The records had been removed from M&L's place of business and were obtained pursuant to a search warrant.

investment, Mr. Norby did not consult an attorney in 1990 or 1991.  He knew that collateral suits against third parties were in progress but chose not to participate in them.  He did not speak with Ms. Jobin, the bankruptcy trustee, in 1990.  He filed a proof of claim in the bankruptcy proceeding on November 5, 1991, seeking recovery of his losses.

While the information Mr. Norby obtained in 1990 indicated M&L's fraud and raised questions about its true financial condition, the record does not support his conclusion that, objectively, his prospects of recovering at least part of his investment were remote or nebulous.

Mr. Norby did not offer any explanation as to why any attempt or suit for recovery would have been futile except to relate that his analysis and subjective feelings led him to believe that his principal investment in M&L had been lost in 1990.  That is not sufficient to meet his burden of proof that there was no prospect of recovery.  See Boehm v. Commissioner, 326 U.S. at 294.

Accordingly, because we conclude that Mr. Premji and Mr. Norby had reasonable prospects for recovery of some of their claimed M&L losses in 1990, we hold that they are not entitled to theft loss deductions in that year.[11]

---

[11]    Petitioners may be entitled to claim theft loss deductions in the year their claims are allowable and paid in the bankruptcy proceeding if their recoveries are less than the principal amounts they invested in M&L.

## 2. Whether Mr. Premji Constructively Received Interest Income In 1990

Between August and October 1990, Mr. Premji received a total of seven checks from M&L representing promised interest payments. He cashed the first four checks in the total amount of $8,000, and conceded that the $8,000 was received as interest in 1990.

After he learned that M&L had filed its bankruptcy petition, Mr. Premji attempted to cash the final interest check, dated October 9, 1990, in the amount of $7,797 at an unspecified bank. The bank refused to honor the check. Consequently, respondent has conceded that the $7,797 was not interest income in 1990.

Mr. Premji contends that the two remaining interest checks in the amounts of $6,444, dated September 23, 1990, and $7,088, dated October 1, 1990, are not interest income in 1990 because he could not have cashed them. He made no attempt to do so. Instead, he returned both checks to M&L to increase his investment. M&L did increase his investment and, accordingly, increased the amount of his interest checks. Mr. Premji's proof of claim in the bankruptcy proceeding is for $77,972, which represents his cumulative investment with M&L.

Respondent argues that the amounts of both checks constitute interest income in 1990 because Mr. Premji, as a cash basis taxpayer, constructively received the income in that year. Respondent first raised this issue in her Amendment to the Answer

seeking an increased deficiency. Therefore, respondent has the burden of proof on the issue. Rule 142(a).

The amounts of both checks would be gross income derived from interest according to the terms of Mr. Premji's arrangement with M&L. See sec. 61(a)(4); Deputy v. DuPont, 308 U.S. 488, 498 (1940); sec. 1.61-1(a), Income Tax Regs.

An item of gross income shall be included in the taxable year when received by the taxpayer unless under the taxpayer's method of accounting the amount is properly reported in a different period. Sec. 451(a). For a cash receipts and disbursement method taxpayer, an item is includable in gross income when it is actually or constructively received. Sec. 1.451-1(a), Income Tax Regs.

Income is constructively received in the taxable year during which it is credited to the taxpayer's account, set apart for him or otherwise made available so that the he may draw upon it at any time. Sec. 1.451-2(a), Income Tax Regs. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. Id.; see also Hornung v. Commissioner, 47 T.C. 428, 434 (1967).

A check that is not subject to substantial restrictions and that the taxpayer could have cashed is income when the check is received. Kahler v. Commissioner, 18 T.C. 31, 34 (1952) (citing Estate of Spiegel v. Commissioner, 12 T.C. 524, 529 (1949)). It follows that where the payor lacked funds to make the payment,

there can be no constructive receipt. Noel v. Commissioner, 50 T.C. 702, 706-707 (1968) (citing Jacobs v. Commissioner, 22 B.T.A. 1166, 1169 (1931) and Gullett v. Commissioner, 31 B.T.A. 1067, 1069 (1935)); see also Basila v. Commissioner, 36 T.C. 111, 115-116 (1961).

Whether the funds were actually available for the taxpayer to draw on, i.e., whether a check could be cashed, is a question of fact. Johnson v. Commissioner, 25 T.C. 499, 503 (1955). We consider all relevant factors. Id.; see also Williams v. Commissioner, T.C. Memo. 1994-560; Rosenberg v. United States, 295 F. Supp. 820, 823-824 (E.D. Mo. 1969), affd. per curiam 422 F.2d 341 (8th Cir. 1970).

We hold that Mr. Premji did not constructively receive the $7,088 represented by the October 1, 1990, check because there were substantial restrictions that would have prevented him from cashing it. That check was dated the same day that M&L filed its bankruptcy petition. Hence, M&L's assets became property of the bankruptcy estate on that day and the automatic stay provided in 11 U.S.C. section 362(a) (1994) would have prevented the bank from paying that check.

Although 11 U.S.C. section 362(b)(11) (1994) creates an exception to the automatic stay for presentment of negotiable instruments, case law interpreting that provision indicates that the exception does not authorize a transfer of bankruptcy estate property. Wittman v. State Farm Life Insurance Co. (In re

Mills), 176 Bankr. 924, 928 (D. Kan. 1994); see also Roete v. Smith, 936 F.2d 963, 965-966 (7th Cir. 1991). Instead, the exception prevents presentment of the instrument from violating the automatic stay. Id.

We also hold that respondent has failed to carry her burden of proof that Mr. Premji constructively received the $6,444 represented by the September 23, 1990, check.

No evidence was introduced to establish M&L's bank account balance or the amounts of outstanding obligations as of September 23, 1990, or for any relevant period. Ms. Jobin testified that M&L's ponzi scheme collected approximately $10 million over the 12 months prior to October 1, 1990, the date the bankruptcy petition was filed. However, there is no evidence as to what part, if any, of this amount was available on or about September 23, 1990, to cover the $6,444 check.

Respondent relies primarily on the fact that Mr. Premji had cashed four of M&L's interest checks in August 1990, at the Bank of Boulder. All four checks are part of the record. That M&L had sufficient funds in its account in August 1990, does not support a finding that funds were available on or about September 23, 1990.

Respondent contends that Mr. Premji exercised dominion and control over the interest income because he reinvested it rather than obtaining cash and that he included it in his $77,972 proof of claim filed in the bankruptcy proceeding. However, these acts

do not support the conclusion that Mr. Premji could have cashed the interest checks. Consequently, because Mr. Premji did not constructively receive either the $6,444 or $7,088 represented by the checks, we conclude that neither amount is includable in his gross income for 1990.

3.  Whether The $8,000 Interest Actually Received by Mr. Premji Should Be Included in His Gross Income for 1990

Mr. Premji received $8,000 as interest in 1990 when he cashed four M&L interest checks in August 1990. The $8,000 was Mr. Premji's promised 10 percent return every 8 days on his initial $20,000 investment.

Although Mr. Premji has conceded that he received the $8,000 in 1990, he contends that it is not includable in his gross income for that year because the open transaction doctrine applies, thus allowing him to recover the full amount of his principal before including any amount of interest in income. He argues that his placement of funds with M&L constituted a risky and speculative investment.[12] He relies on Burnet v. Logan, 283 U.S. 404 (1931); Underhill v. Commissioner, 45 T.C. 489 (1966); and Liftin v. Commissioner, 36 T.C. 909, affd. 317 F.2d 234 (4th Cir. 1963). Respondent counters that Mr. Premji's circumstances are distinguishable from those cases, and, therefore, the open

_____

[12]    Mr. Premji has not argued that the amount of interest he was to receive was uncertain.

transaction doctrine is inapplicable. Mr. Premji bears the burden of proof on this issue. Rule 142(a).

The open transaction doctrine permits a taxpayer who receives installment payments on the sale or other disposition of property to recover his basis prior to recognizing gain where the amount realized is not susceptible to valuation. See Burnet v. Logan, supra at 413. It has been applied to purchasers of installment obligations at a discount to enable the taxpayer to recover the cost and a major portion of the discount before recognizing gain where there was no reasonable certainty that all payments on the obligation would be made. See Liftin v. Commissioner, supra at 911; cf. Underhill v. Commissioner, supra at 492-496. Thus, the essence of the open transaction doctrine is uncertainty that the taxpayer will recover the full amount of his basis or cost.

Mr. Premji invested $58,000 with M&L on four separate occasions by cashier's check as follows:

|                     |          |
|---------------------|---------:|
| July 31, 1990       | $20,000  |
| August 30, 1990     | 4,000    |
| September 5, 1990   | 14,000   |
| September 13, 1990  | 20,000   |
|                     | $58,000  |

Of the $58,000 total amount, we are here concerned with only the $20,000 invested on July 31, 1990, because that is the principal that gave rise to the $8,000 in interest Mr. Premji actually received.

It is our view that this situation does not fall within the parameters of the open transaction doctrine, which is limited to rare and extraordinary circumstances. Estate of Wiggins v. Commissioner, 72 T.C. 701, 708 (1979). Here we find that Mr. Premji has failed to carry his burden of proof that it was uncertain he would recover his principal.

Mr. Premji overlooks the fact that M&L returned the full amount of his principal during August 1990. He conceded that he received a $20,000 check representing the full amount of his principal each time he received a $2,000 interest check. Although he cashed the $2,000 checks, he voluntarily chose not to liquidate his investment by cashing any one of the $20,000 checks. Instead, Mr. Premji chose to reinvest that amount by returning each $20,000 check to M&L.

The record contains no bank account statements for M&L or other evidence that any one of these $20,000 checks would not have been honored on presentment during the month of August. Contrary to Mr. Premji's assertion that his principal might not be repaid, it was made available to him. He voluntarily chose to reinvest that principal rather than liquidate the investment.

Consequently, we hold that Mr. Premji has not shown that it was uncertain he would recover his $20,000 principal and that the open transaction doctrine applies in these circumstances. Thus, the $8,000 interest he received in 1990 constitutes gross income in that year.

To the extent arguments made by the parties have not been addressed, we deem them to be without merit.

To reflect concessions made by the parties and our conclusions with respect to the disputed issues,

<u>Decisions will be entered under Rule 155</u>.