THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL B. HOFER, Defendant-Appellant.

Third District    No. 3—02—0758

Opinion filed February 27, 2004.

Santiago A. Durango, of State Appellate Defender's Office, of Ottawa, for appellant.

Edward D. Smith, State's Attorney, of Kankakee (Lawrence M. Bauer, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Deidre Donnellan, of Plainfield, for the People.

JUSTICE SCHMIDT delivered the opinion of the court:

Following a bench trial, the defendant, Daniel B. Hofer, was convicted of home repair fraud (815 ILCS 515/3 (West 1998)) and was sentenced to, *inter alia*, 30 months' reporting probation and 60 days' home detention. On appeal, the defendant argues that the State failed to prove the elements of the offense beyond a reasonable doubt. The State contends that this argument is waived. We rule that the defendant's argument is not waived and affirm.

## BACKGROUND

The complainant, Victor Bruce Cutright, testified that he is a teacher and he lives on a farm near the town of Grant Park. In March 1998, he contacted two carpenters about constructing "a pole building, a farm building" on his property. Both of the carpenters said they were unavailable to construct the building. The defendant testified that after he spoke with one of these carpenters, he contacted Cutright and of-

fered to construct the building. The defendant was doing business as Prairie State Post Frame.

On March 4, 1998, the defendant went to Cutright's residence and discussed the project. The two men executed a written agreement for construction of the "pole barn." The defendant testified that the building was to be located "toward the back half of [Cutright's property]." The defendant stated that in the "main area where [Cutright] lives, there was a—like a block type building. And it was to be to the west of that."

Under the agreement, Cutright was to pay the defendant $16,000 on the following schedule: 25% as a down payment, 50% when the building was framed, and the remaining 25% upon completion. Cutright wrote a check to the defendant for $4,000 on March 4, 1998, which the defendant cashed on March 5, 1998.

The defendant told Cutright that he would order the materials for the building through Menards. Under the terms of the agreement, the defendant was responsible for obtaining blueprints, a building permit, an insurance certificate, and ordering the building's trusses.

Cutright testified that on March 14, 1998, the defendant came to Cutright's "residence," where the two men dismantled a lean-to structure attached to a barn. Cutright told the defendant that he would like to increase the size of the pole barn because of the space now vacated by the lean-to. The defendant told Cutright that increasing the building's size was "not a problem." The defendant stated that he would revise the proposal and get back to Cutright about the construction project.

Cutright had no contact with the defendant until late April or early May when Cutright "ran into" the defendant at a local fish fry. Cutright asked the defendant about ordering the trusses, the blueprints, the building permit, and the insurance certification. The defendant assured Cutright that he was "working on it" and that he would "drop it by" for Cutright. Cutright testified that the defendant did not perform any of his obligations under the agreement. Cutright said that he called the defendant by telephone at least two dozen times on different days of the week and different times of day, but the defendant never answered.

The defendant testified that he submitted a material list to Menards on May 12, 1998. However, Cutright stated that he contacted an employee of Menards, who said Menards had not received any order for materials under the name Cutright, Hofer, or Prairie State Post Frame.

An architect, John Larson, testified that the defendant contacted him about drawing the blueprints for the building for $350. Larson

said that he met with the defendant on June 4, 1998, about the blueprints and that the defendant paid him $300 on June 6, 1998. Larson stated that he delivered the blueprints to the defendant on June 29, 1998, whereupon the defendant paid Larson the remaining $50. On cross-examination, the defendant denied having met with Larson on June 4, 1998. The defendant also denied having paid Larson $300 on June 6, 1998. The defendant stated that he received the blueprints from Larson on July 2, 1998. Cutright submitted that the first time he had learned that the blueprints existed was on the morning of the trial.

Cutright testified that on June 22, 1998, he contacted the sheriff's department about the defendant's failure to perform on the contract and failure to communicate with him. Eventually, Cutright contacted the State's Attorney's office, the Attorney General's office, and his private attorney about the matter.

On July 8, 1998, Cutright's attorney sent a letter to the defendant demanding repayment of the $4,000 down payment. In the letter, Cutright's attorney stated that the defendant was not to do any work on the building project.

On August 7, 1998, the State charged the defendant with aggravated home repair fraud (815 ILCS 515/5 (West 1998)). At the conclusion of the trial, the State asked the court to find the defendant guilty of the lesser included offense of home repair fraud.

The court found the defendant guilty of the lesser included offense. In so ruling, the judge stated that she found Cutright and Larson to be credible witnesses. She said that she found the defendant not to be credible because he had lied about his two meetings with Larson in early June.

The defendant filed a motion to reconsider the court's finding of guilt. In this motion, the defendant argued that the State failed to prove beyond a reasonable doubt that he did not intend to perform on the contract. The motion was denied.

The parties agreed that the defendant would pay Cutright $4,262.50 in restitution. The defendant then was sentenced and he appealed.

## ANALYSIS

The defendant contends that the State failed to prove the elements of the offense beyond a reasonable doubt. He submits that the breach of his promise to construct a pole barn did not establish a violation of the Home Repair Fraud Act (Act) (815 ILCS 515/1 *et seq.* (West 1998)).

The State argues that the defendant's issue is waived on appeal because the defendant failed to raise it in the trial court.

## I. Waiver

■ A defendant may raise for the first time on appeal the issue that the State failed to prove the elements of the crime beyond a reasonable doubt. *People v. King*, 151 Ill. App. 3d 644, 503 N.E.2d 384 (1987).

In this case, the defendant is raising a reasonable doubt argument for the first time on appeal. Under *King*, this issue is not waived.

## II. Reasonable Doubt

The defendant contends that the proposed construction of a pole barn on Cutright's property did not fall within the ambit of the Act's definition of a "home repair."

■ When analyzing the sufficiency of the evidence, we review the evidence in the light most favorable to the prosecution and consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Barham*, 337 Ill. App. 3d 1121, 788 N.E.2d 297 (2003).

■ Under the Act:

"(a) A person commits the offense of home repair fraud when he knowingly enters into an agreement or contract, written or oral, with a person for home repair, and he knowingly:

\*\*\* promises performance which he does not intend to perform or knows will not be performed." 815 ILCS 515/3(a)(1) (West 1998).

The Act contains the following definitions that are relevant to our inquiry:

"(a) 'Home Repair' means the fixing, replacing, altering, converting, modernizing, improving of or the making of an addition to any real property primarily designed or used as a residence.

(1) Home repair shall include the construction, installation, replacement or improvement of driveways, swimming pools, porches, kitchens, chimneys, chimney liners, *garages*, fences, fallout shelters, central air conditioning, central heating, boilers, furnaces, hot water heaters, electrical wiring, sewers, plumbing fixtures, storm doors, storm windows, awnings and other improvements to structures within the residence or upon the land adjacent thereto.

\* \* \*

(c) 'Residence' means a single or multiple family dwelling, including but not limited to a single family home, apartment building, condominium, duplex or townhouse which is used or intended to be used by its occupants as their dwelling place." (Emphasis added.) 815 ILCS 515/2(a)(1), (c) (West 1998).

This court's research has not revealed any Illinois case interpreting the provisions of the Act at issue in this case. Therefore, we are called upon to interpret portions of the Act as a matter of first impression.

■ The cardinal rule of statutory construction is to determine and give effect to the intent of the legislature. *People v. Hamalainen*, 341 Ill. App. 3d 205, 792 N.E.2d 511 (2003). The best indication of the legislature's intent is the language of the statute. *Hamalainen*, 341 Ill. App. 3d 205, 792 N.E.2d 511. Such language should be given its plain or ordinary and popularly understood meaning. *Hamalainen*, 341 Ill. App. 3d 205, 792 N.E.2d 511.

■ When a statute provides a list that is not exclusive, that is, when it uses the phrase "shall include," the Illinois Supreme Court has stated that "established rules of statutory construction inform us that *** the class of unarticulated things will be interpreted as those that are similar to the named things." *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 48, 779 N.E.2d 875, 882 (2002).

■ In the present case, the record indicates that the defendant entered into a written agreement with Cutright to build a structure that was referred to variously as "a pole building," "a pole barn," and "a farm building." Although such a structure is not explicitly listed in section 2(a)(1) of the Act, this section contains a nonexclusive list. Under *Birkett*, the type of building proposed was similar to the types of structures named in the list.

One can hardly drive through rural Illinois without noticing the burgeoning number of "pole barns" or "Morton buildings" in the yards of rural landowners. These buildings are to the country dweller or gentleman farmer what the garage is to the suburbanite. However, no self-respecting "land baron" would even think about calling this building where he parks his pickup truck, SUV, garden tractors, *et cetera*, a "garage." Nonetheless, we find that the construction of a pole barn behind plaintiff's house is sufficiently similar to, if not identical to, the construction of a garage, and therefore falls within the statutory definition of home repair.

Further evidence also supported the conclusion that the proposed building at issue fell within the Act's definition of a "home repair." The parties referred to Cutright's property throughout the trial as his "residence." The defendant testified that the proposed building was to be constructed within the "main area" where Cutright lives. The agreement was for the "construction" of a building similar to structures listed in section 2(a)(1), "upon the land adjacent" to Cutright's residence.

A rational trier of fact could have found beyond a reasonable doubt that the defendant knowingly entered into an agreement with Cutright for a home repair, and knowingly promised performance which he did not intend to perform or knew would not be performed. Taking the evidence in the light most favorable to the prosecution, a rational trier

of fact could have found that the State proved beyond a reasonable doubt that the defendant committed home repair fraud.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the Kankakee County circuit court.

Affirmed.

McDADE and SLATER, JJ., concur.