T.C. Memo. 2013-66

UNITED STATES TAX COURT

JAMES M. URTIS AND GAETANA R. URTIS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21203-11.                          Filed March 5, 2013.

James M. Urtis and Gaetana R. Urtis, pro sese.

Grubert Roger Markley, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge: Respondent determined a deficiency in petitioners' 2007

Federal income tax of $52,944[1] as a result of his determination that they

improperly claimed a $188,070 theft loss deduction. Respondent also determined

_____

[1] All dollar amounts are rounded to the nearest dollar.

[*2] an accuracy-related penalty under section 6662(a)[2] of $10,589. The issues remaining for decision are:

(1) whether petitioners are entitled to the $188,070 theft loss deduction under section 165. We hold that they are; and

(2) whether petitioners are liable for the 20% accuracy-related penalty under section 6662(a). Because petitioners are entitled to the theft loss deduction, no accuracy-related penalty applies.

## FINDINGS OF FACT

At the time the petition was filed, petitioners resided in Illinois.

At the relevant times Mr. Urtis was a lawyer and Mrs. Urtis was a homemaker. During the latter half of 2005 Mrs. Urtis was pregnant with petitioners' sixth child, and petitioners decided to expand the size of their house. On October 25, 2005, they entered into a contract with Onyks Construction & Remodeling (Onyks Construction), under which they would pay a total of $400,000 for Onyks Construction to destroy an existing portion of their house and construct an addition in place of the destroyed portion. Onyks Construction was

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] owned and operated by Dariusz Potok, who would oversee the construction at petitioners' house.

The $400,000 contract price was to be paid in installments upon Onyks Construction's completion of certain construction milestones. Onyks Construction was required under the contract not just to construct the exterior portion of the addition, but also to complete the necessary wiring, plumbing, air-conditioning, and heating upgrades. During the many months of construction petitioners' house was uninhabitable; petitioners and their children stayed in an apartment above the residence of Mrs. Urtis' mother and father during this time.

Onyks Construction began work on the project in November 2005 by demolishing the specified portion of petitioners' house. Petitioners often saw a number of Onyks Construction employees and subcontractors at the site. By January 2006 the project was progressing, and petitioners had made several payments to Onyks Construction/Mr. Potok. However, in February 2006 the demolition portion of the project was complete, and Mr. Potok began demanding that petitioners make payments to him before completion of associated project milestones. Mr. Potok claimed that he needed the payments early for construction-related reasons (such as payment of subcontractors or payment for supplies) and told petitioners that if he did not receive the payments early he would have to

**[*4]** delay the project. Petitioners were eager to move back into their home as soon as possible (partially because Mrs. Urtis gave birth in February 2006) and made the requested payments.

Mr. Potok's requests for early payments continued for the next several months. Petitioners continued to make the requested payments but attempted to protect their money by increasingly making payments directly to subcontractors and suppliers instead of Mr. Potok/Onyks Construction. Petitioners were concerned by Mr. Potok's requests, although their concerns were somewhat alleviated by the fact that they saw signs of progress when they visited the home. However, some of the apparent progress was actually an illusion, part of Mr. Potok's ruse. For example, Mr. Potok showed Mr. Urtis portions of the wiring in the addition under construction and claimed that the wiring portion of the project had been completed. In fact, the wiring had not been completed. Not being experts in construction, petitioners were unable to detect that Mr. Potok was lying to them about some aspects of the construction which he claimed to have completed.

Construction was running behind schedule when on July 29, 2006, Mr. Potok suddenly died at the age of 30. Petitioners were alerted to Mr. Potok's death and went to his wake to try and find out what would happen with regard to

[*5] the construction.[3]  At the wake, petitioners discovered that many of Mr. Potok's subcontractors were not being paid and that Mr. Potok was involved in several other construction projects which were undergoing financial difficulty.  As a result of their conversations with others at the wake, petitioners also came to believe that Mr. Potok had a drug problem which may have contributed to his financial problems and subsequent death.[4]

Soon after Mr. Potok's death, petitioners became aware that not only had Mr. Potok used portions of the payments they had made to him for purposes unrelated to their home construction project, but that Onyks Construction had damaged some of petitioners' property during construction, such as their heating system, furniture, flooring, shrubbery, and patio.  Some of the damage occurred because Onyks Construction failed to correctly protect the interior of petitioners' house from outdoor elements during construction.[5]

Before beginning construction in 2005, Mr. Potok had informed petitioners that Onyks Construction was insured through Essex Insurance Co. (Essex

---

[3]Many of Mr. Potok's employees attended the wake.

[4]Mr. Potok's death certificate states that the cause of death is "pending toxicologic studies".

[5]A large portion of petitioners' walls was improperly covered and removed during demolition.

[*6] Insurance) and had shown them proof of insurance. On August 10, 2006, petitioners made a claim on Onyks Construction's insurance policy "for negligent construction, property damage, and failure to perform." Petitioners were unaware at that time what acts the insurance policy covered. They attempted to get a copy of the insurance policy from either Essex Insurance or Mr. Potok's wife, Anita Szyszlak, but were not immediately supplied with a copy of the policy.

In October 2006 petitioners filed a lawsuit against Onyks Construction in the Circuit Court of Cook County, Illinois, alleging they had incurred damages as the result of actions by Onyks Construction. On October 24, 2006, the judge in the case ordered Essex Insurance to supply petitioners with a copy of the insurance policy. However, Essex Insurance filed a motion to vacate the court's order for lack of jurisdiction. In early November petitioners filed another motion seeking a court order commanding Ms. Szyszlak to provide them with a copy of the insurance policy. The court issued the requested order shortly after the motion was filed. Petitioners' attempts to procure the insurance policy became bogged down in litigation for several months, but petitioners finally procured a copy of the

**[\*7]** policy in March 2007.[6] Petitioners received an apology from the insurance supplier "for the misunderstanding" .

The insurance policy states that it does not apply to "Knowing Violations Of Rights Of Another" which are "caused by or at the direction of the insured with the knowledge that the act would violate the rights of another." Upon review of the policy, petitioners determined that they could not recover under the policy for Mr. Potok's improper use of the funds they paid to him. Their lawsuit proceeded on grounds that Onyks Construction negligently damaged their property during construction. During this litigation it was revealed that the insurance policy had lapsed because Onyks Construction (at the direction of Mr. Potok) ceased paying insurance premiums shortly after entering into the contract with petitioners. Petitioners eventually settled their case in early 2009 and received $10,000 from Essex Insurance in February 2009.

As previously stated, petitioners became aware after his death that Mr. Potok and Onyks Construction were in financial trouble. However, petitioners

---

[6]It is not clear why the policy was supplied to petitioners by the James J. Levine Insurance Agency, Inc, instead of Essex Insurance. The parties did not acknowledge or provide information regarding this fact but agree that the insurance policy petitioners received in March 2007 is the relevant policy. As stated infra, Essex Insurance eventually paid petitioners $10,000 in settlement of the litigation.

[*8] initially had hoped that they might be able to recover some of their funds either from Mr. Potok's estate or from Onyks Construction. However, Onyks Construction was involuntarily dissolved on April 13, 2007,[7] by the State of Illinois, and petitioners were not able to recover funds from that entity. Petitioners checked several times to determine whether an estate had been established for Mr. Potok, but none had (nor had a will been probated) as of April 1, 2010. Petitioners did not otherwise recover funds from Mr. Potok or his family.

Over the course of 2005 and 2006 petitioners made payments to Mr. Potok/Onyks Construction and related persons/entities totaling approximately $400,000. After Mr. Potok's death petitioners also made significant payments to other companies to repair the damage to and complete construction on their house. Petitioners claimed a $188,070 theft loss deduction on their 2007 income tax return as a result of the funds paid to Mr. Potok which petitioners determined he had improperly used for purposes other than their construction project. The claimed deduction amount does not include damages to their property resulting from the alleged negligence of Onyks Construction during construction.

---

[7]A related company also owned by Mr. Potok, Onyks Construction Builders, was also involuntarily dissolved on October 12, 2007.

**[\*9]** Respondent disallowed the theft loss deduction on June 17, 2011, and issued a notice of deficiency to petitioners for 2007. Petitioners timely filed a petition contesting the deficiency. A trial was held in June 2012 in Chicago, Illinois.

OPINION

I. Burden of Proof

The Commissioner's determinations in a notice of deficiency are presumed correct, and taxpayers bear the burden of proving that the Commissioner's determinations are incorrect. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and taxpayers bear the burden of proving that they have met all requirements necessary to be entitled to the claimed deductions. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). However, under section 7491(a), if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability and meets other requirements, the burden of proof shifts from the taxpayer to the Commissioner as to that factual issue. Because we decide this issue on the basis of the preponderance of the evidence, we need not decide upon which party the burden of proof rests. See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008).

**[\*10]** II.  Section 165 Theft Loss Deduction

A.  Arguments of The Parties

Respondent has not disputed the fact that petitioners incurred a loss due to the improper actions of Mr. Potok, nor has respondent disputed the amount of the claimed loss ($188,070).  Rather, respondent argues that petitioners are not entitled to the claimed theft loss deduction because:  (1) Mr. Potok did not engage in a theft as defined under Illinois State law; and (2) the deduction should have been claimed for 2006 rather than 2007.  Petitioners argue that they are entitled to the deduction because Mr. Potok committed a crime under Illinois State law and that they properly claimed the deduction for 2007.  We agree with petitioners.

B.  Whether Petitioners Suffered a Loss by Theft Under Section 165

Section 165 allows an individual taxpayer to deduct certain losses arising from theft.  As we have previously stated:

> As used in the statute, theft is intended to incorporate any criminal taking of another's property, including the crime of false pretenses. The factual existence of the theft must be established by reference to the law of the jurisdiction where the loss occurred.  Although a criminal conviction in a state court may conclusively establish the existence of a theft, the deduction does not depend upon whether the thief is convicted, prosecuted, or even whether the taxpayer chooses to move against him.  Moreover, the taxpayer must prove a theft occurred under the relevant state statute only by a preponderance of the evidence.

[*11] Hartley v. Commissioner, T.C. Memo. 1977-317, 1977 Tax Ct. Memo LEXIS 125, at *8-*9 (citations omitted). We have also stated that "The term 'theft' as used in the Code is 'a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile.'" Gerstell v. Commissioner, 46 T.C. 161, 171-172 (1966) (quoting Edwards v. Bromberg, 232 F.2d 107, 110 (5th Cir. 1956)); see also Huey v. Commissioner, T.C. Memo. 1985-348, 1985 Tax Ct. Memo LEXIS 294, at *9.

In Hartley we held that the taxpayers were entitled to a theft loss deduction where they showed that a homebuilder had committed the crime of false pretenses under Nebraska law when the homebuilder induced the taxpayers to advance the homebuilder cash which was then wrongfully used by the homebuilder for purposes other than construction of their home. While the facts were similar to those of the present case in many respects, the homebuilder in Hartley absconded with the taxpayers' money; in the present case, Mr. Potok died shortly after taking petitioners' money and using the $188,070 for purposes other than construction on their home. In addition, Hartley arose in the State of Nebraska. In this case we must determine whether a crime has been committed under Illinois State law.

**[*12]** Under 815 Ill. Comp. Stat. 515/3(a) (West 2008):[8]

> A person commits the offense of home repair fraud when he knowingly enters into an agreement or contract, written or oral, with a person for home repair, and he knowingly:
>
> (1) Misrepresents a material fact relating to the terms of the contract or agreement * * *; or
>
> (2) uses or employs any deception, false pretense or false promises in order to induce, encourage or solicit such person to enter into any contract or agreement.

"Home repair" is defined in 815 Ill. Comp. Stat. 515/2(a)(1) (West 2008) as including:

> construction, installation, replacement or improvement of driveways, swimming pools, porches, kitchens, chimneys, chimney liners, garages, fences, fallout shelters, central air conditioning, central heating, boilers, furnaces, hot water heaters, electrical wiring, sewers, plumbing fixtures, storm doors, storm windows, awnings and other improvements to structures within the residence or upon the land adjacent thereto.

We find that the contract at issue was a contract for "home repair" as that term is defined in 815 Ill. Comp. Stat. 515/2(a)(1). Not only did the contract encompass several of the items expressly listed in that statute (such as improvements to/construction of wiring, air-conditioning, heating, and plumbing fixtures); the construction of a home addition is similar as a whole to other items

---

[8]This statute has remained unchanged during all relevant years.

**[*13]** listed (such as construction of a kitchen or porch). See People v. Hofer, 806 N.E.2d 662 (Ill. App. Ct. 2004) (defendant guilty of home repair fraud when he failed to perform his obligations under a contract for construction of a "pole barn" structure similar to a garage).

Considering the facts, we also find that Mr. Potok knowingly induced petitioners to enter into the contract by using deception and misrepresentations. The contract provides that Onyks Construction was required to give petitioners copies of its "current insurance certificates evidencing the insurance required under this Agreement" and that Onyks Construction was required to notify petitioners of any changes with regard to its insurance. However, shortly after entering into the contract with petitioners and showing them proof of insurance, Onyks Construction (at the direction of Mr. Potok) ceased paying the premiums on its insurance policy, causing the policy to lapse. Petitioners were not notified that the policy had lapsed. Several months later Mr. Potok began making other false statements and representations to petitioners regarding: (1) work which had allegedly been completed on their home; and (2) his need for funds to be paid in a manner other than that specified in the contract so that construction could proceed.

The preponderance of the evidence favors the proposition that Mr. Potok's actions satisfied each necessary element of 815 Ill. Comp. Stat. 515/3(a). We thus

**[\*14]** conclude that Mr. Potok committed the crime of home repair fraud under Illinois State law.

Respondent did not address 815 Ill. Comp. Stat. 515/3(a) or Mr. Potok's misrepresentations regarding the insurance policy at the time the contract was signed. Rather, respondent argued only that no theft occurred under 720 Ill. Comp. Stat. 5/16-1 (2003) at the time the funds were taken. Respondent argues that petitioners failed to prove that Mr. Potok's improper taking of their money was anything more than "a failure to comply with the terms of the construction agreement." We disagree.

It is clear that by virtue of his criminal fraud Mr. Potok induced petitioners to enter into a contract which allowed him to obtain significant funds from them. Nearly half of those funds ($188,070) were then improperly used for purposes other than construction on petitioners' home. We will not attempt to distinguish Mr. Potok's criminal intent in causing petitioners to enter the contract from his intent in taking the improperly used $188,070 from them; we believe these intertwined actions were part of a scheme by Mr. Potok to wrongfully obtain funds belonging to petitioners. We therefore find that petitioners were the victims of a "theft" as that term is defined for purposes of section 165 and may claim a theft loss deduction under that section.

**[\*15]** C.  <u>Whether the Deduction Was Properly Claimed for 2007</u>

A theft loss is sustained during the taxable year in which the taxpayer discovers the loss.  Sec. 165(e); secs. 1.165-1(d)(3), 1.165-8(a)(2), Income Tax Regs.  Generally, the appropriate year for a loss deduction is the year in which the loss is sustained.  Sec. 165(a); sec. 1.165-1(d)(1), Income Tax Regs.  However, if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no deduction shall be claimed until the taxable year in which it can be ascertained with reasonable certainty whether such reimbursement will be received.  Sec. 1.165-1(d)(3), Income Tax Regs.

"A reasonable prospect of recovery exists when the taxpayer has a bona fide claim for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in the taxpayer's favor."  <u>Premji v. Commissioner</u>, T.C. Memo. 1996-304, 1996 Tax Ct. Memo LEXIS 309, at \*22 (citing <u>Ramsay Scarlett & Co. v. Commissioner</u>, 61 T.C. 795, 811 (1974)), <u>aff'd without published opinion</u>, 139 F.3d 912 (10th Cir. 1998).  However, claims with only remote or nebulous potential for success will not postpone thededuction.  <u>United States v. S.S. White Dental Mfg. Co.</u>, 274 U.S. 398, 403 (1927); <u>Ramsay Scarlett & Co. v. Commissioner</u>, 61 T.C. at 811.

**[*16]** Whether a reasonable prospect of recovery exists is a question of fact, determined by examining all facts and circumstances. Sec. 1.165-1(d)(2)(i), Income Tax Regs. "The standard to be applied is primarily objective, but the taxpayer's subjective attitude and beliefs are not to be ignored." Premji v. Commissioner, 1996 Tax Ct. Memo LEXIS 309, at *23 (citing Boehm v. Commissioner, 326 U.S. 287, 292-293 (1945), and Ramsay Scarlett & Co. v. Commissioner, 61 T.C. at 812).

One of the relevant factors in considering whether a reasonable prospect of recovery exists is whether the taxpayer has filed a lawsuit to recoup the loss. Dawn v. Commissioner, 675 F.2d 1077, 1078 (9th Cir. 1982), aff'g T.C. Memo. 1979-479; Premji v. Commissioner, 1996 Tax Ct. Memo LEXIS 309, at *22. "Unless litigation is speculative or without merit, where the taxpayer deems the chance of recovery sufficiently probable to warrant bringing a lawsuit and pursuing it with reasonable diligence to a conclusion, the taxpayer should postpone the loss deduction until the litigation is terminated." Premji v. Commissioner, 1996 Tax Ct. Memo LEXIS 309, at *24 (citing Estate of Scofield v. Commissioner, 266 F.2d 154, 159 (6th Cir. 1959), aff'g in part, rev'g in part 25 T.C. 774 (1956), and Gale v. Commissioner, 41 T.C. 269, 276 (1963)).

[*17] Petitioners argue that they had a reasonable prospect of recovery during 2006 which expired in 2007. Respondent claims that petitioners had no reasonable prospect of recovery in 2006 and are therefore not entitled to claim a theft loss deduction for 2007. We agree with petitioners.

Mr. Urtis testified that petitioners believed during 2006 that they could possibly recover from Mr. Potok's estate, from Onyks Construction, or from Essex Insurance. Petitioners sought to obtain the Onyks Construction insurance policy from both Essex Insurance and Ms. Szyszlak in August 2006 but were not immediately supplied with a copy of the policy. Petitioners then filed a lawsuit in October 2006 and obtained court orders to get the policy. However, because of litigation regarding the orders, petitioners did not obtain a copy of the insurance policy until March 2007, at which time they realized they had no chance of recovery under the policy for their theft loss. Mr. Urtis testified that petitioners also realized during 2007 that they would not be able to recover from Mr. Potok's estate or from Onyks Construction. Petitioners point out that: (1) Onyks Construction was involuntarily dissolved by the State of Illinois in April 2007;[9] and (2) no estate was established or will probated for Mr. Potok during 2007.

---

[9]Another entity owned by Mr. Potok was also involuntarily dissolved during 2007.

**[*18]** We find Mr. Urtis' testimony to be credible and supported by the evidence. At the time of Mr. Potok's death there were approximately five months remaining in 2006. Although petitioners moved quickly in an attempt to recover their theft loss, many things were beyond their control, including: (1) their inability to obtain a copy of the insurance policy during 2006; (2) the timeframe in which it became apparent that no will would be probated or estate established for Mr. Potok; and (3) the date on which the State of Illinois dissolved Mr. Potok's businesses. Two of these items were conclusively resolved during 2007 (receipt of the insurance policy and dissolution of Mr. Potok's businesses). We also believe petitioners' claim that they came to realize during 2007 that they could not recover from Mr. Potok's estate. This claim is supported not just by the fact that no will was probated or estate established during 2007,[10] but also by the fact that the State of Illinois began dissolving Mr. Potok's businesses (which would confirm petitioners' beliefs that Mr. Potok was in financial difficulty).

In support of his argument that petitioners had no reasonable prospect of recovery in 2006, respondent points to a letter Mr. Urtis wrote to respondent in May 2012 (before trial). The letter responds to correspondence petitioners had

---

[10]Given the date of Mr. Potok's death, we believe 2007 represents a reasonable timeframe in which one would expect a will to be filed in probate court or an estate to be established.

**[*19]** received from respondent. In the correspondence respondent states that "the evidence does not show reasonable efforts [made] to recover the money" and that the lack of such efforts "would likely seriously diminish * * * [petitioners'] case in the eyes of the court."

In his response letter Mr. Urtis states that "following * * * [Mr. Potok's] death" Mr. Urtis met with Ms. Szyszlak and determined that Mr. Potok's "liabilities far exceeded his assets" on the basis of the information he was provided. However, the letter also states that Mr. Urtis attempted to verify this information by checking to see whether an estate had been opened for Mr. Potok. Mr. Urtis' letter further states that he "performed an asset search for * * * [Onyks Construction] which revealed that the corporation was without any assets whatsoever" and that Onyks Construction "ceased to exist upon * * * [Mr. Potok's] death." Regarding the insurance policy and lawsuit, the letter states that "the only policy of insurance that I had to work with was one which was questionably in effect and which, if in effect, did not provide coverage for the" theft loss. The letter goes on to state that "with that knowledge, I made a claim on the insurance policy" for the property damage, but not the theft loss.

We do not assign a great deal of weight to Mr. Urtis' letter. The letter was written to explain the ways in which petitioners sought to recover from Mr. Potok,

[*20] Onyks Construction, and Essex Insurance.  In doing so, the letter focuses on the ways in which recovery was attempted and is vague or simply incorrect about the dates involved and the order of events.

First, the letter states that Mr. Urtis was told that Mr. Potok's personal liabilities were greater than his assets after interviewing Ms. Szyszlak.  However, the letter goes on to state that Mr. Urtis sought to verify this information by checking "to see if there was any estate * * * opened in relation to" Mr. Potok.[11]  As discussed supra, no estate was opened in 2006, and we believe it was reasonable for petitioners to conclude in 2007 that recovery from Mr. Potok's potential estate was unlikely.

Second, the letter is vague when referring to the time at which Mr. Urtis determined that Onyks Construction had no assets, only stating that Mr. Urtis "performed an asset search".  The letter also states that Onyks Construction "ceased to exist upon * * * [Mr. Potok's] death" but goes on to state that Onyks Construction "was dissolved involuntarily in 2007 (upon [Mr. Potok's] death)." (Emphasis supplied.)  These statements show the apparent lack of regard which

---

[11]We believe verifying the information Mr. Urtis received from Ms. Szyszlak was a reasonable action given Mr. Potok's prior deceit.

[*21] was paid to the dates in the letter, as the facts that Mr. Potok died in July 2006 and that Onyks Construction was dissolved in April 2007 are uncontroverted.

Finally, although respondent interprets the letter to suggest that petitioners were aware that the insurance policy did not cover their theft loss before they filed the lawsuit, such a belief runs counter to Mr. Urtis' testimony that he was unaware of the contract terms until he received a copy of the policy in March 2007.[12]  This testimony is strongly supported by the evidence; petitioners sought to obtain a copy of the policy in August 2006, then had to go through several months of litigation before they received the policy in March 2007.

Considering the facts as a whole we find that petitioners had a reasonable prospect of recovery in 2006 and that petitioners' prospect of recovery became remote in 2007.  As a result, we find that 2007 was the correct year for which to claim the theft loss deduction.

---

[12]The fact that petitioners did not receive a copy of the insurance policy until 2007 appears to be uncontroverted; one of the findings of fact in respondent's brief states that "Petitioners received an actual copy of the contractor's insurance policy in March 2007."

**[\*22]** D.  <u>Conclusion Regarding the Theft Loss Deduction</u>

As discussed <u>supra</u>, petitioners lost funds as a result of the "theft" and 2007 was the correct year for which to claim a deduction for that loss.  Respondent has not disputed the amount of the claimed loss ($188,070).  Accordingly, we hold that petitioners are entitled to a $188,070 theft loss deduction for 2007.

III.  <u>Conclusion</u>

We hold that petitioners are entitled to a $188,070 theft loss deduction for 2007.  Because we have decided this issue in petitioners' favor, there is no underpayment upon which an accuracy-related penalty may be imposed and we need not address that issue.  In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioners</u>.