# United States Tax Court

T.C. Memo. 2024-47

MICHAEL C. GIAMBRONE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

WILLIAM W. GIAMBRONE AND MICHELE L. GIAMBRONE,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket Nos. 11109-18, 11153-18.               Filed April 18, 2024.

———————

*Robert E. McKenzie*, *Kathleen M. Lach*, and *Thomas A. Laser*, for petitioners.

*Elizabeth A. Carlson*, *Richard L. Wooldridge*, *Michael T. Shelton*, and *William Benjamin McClendon*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

URDA, *Judge*: In 2007 Platinum Bancshares, Inc. (Holding), a holding company that owned a troubled savings and loan institution named Platinum Community Bank (Platinum), was in desperate need of capital.[1]  The owners of the controlling interest in Holding, Michael

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code or I.R.C.), in effect at all relevant times, regulation

**[\*2]** and William Giambrone (petitioners, along with William's wife, Michele[2]), turned to Lee Bentley Farkas, a prominent and highly regarded businessman in the mortgage industry. After some negotiation, Mr. Farkas bought $10 million of newly issued stock in Holding, which gave one of his companies a controlling 75% stake.

All that glittered was not gold. Mr. Farkas turned out to have been involved in a long-running, multibillion-dollar fraud scheme when he purchased control of Holding. His intrigues came to an end in 2009, but not before they ensnared Platinum and resulted in its closure and placement into receivership. Mr. Farkas was indicted in 2010, followed the next year by a conviction on 14 counts of fraud and an order to pay restitution of $3.5 billion to 20 specific victims, not including the Giambrones, Holding, or Platinum.

The Giambrones claimed theft loss deductions exceeding $3.8 million on their respective 2012 federal income tax returns, which they carried forward on their returns for several later years. Specifically, the Giambrones assert that they suffered a theft by deception of their control of Holding. They fail to establish, however, that they suffered any theft in connection with Mr. Farkas's stock purchase or that any such theft loss should be recognized for 2012. We accordingly will sustain the IRS's notices of deficiency disallowing these deductions and determining accuracy-related penalties.

FINDINGS OF FACT

These consolidated cases were tried during the Court's special trial session in Chicago, Illinois, beginning on March 14, 2022. We base our factual findings on the stipulations of facts, and the testimony and other evidence admitted at trial, as well as the parties' pleadings. The Giambrones lived in Illinois when they timely filed their petitions in this Court.

---

references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[2] In this opinion, we will refer to all three petitioners as the Giambrones, the brothers acting in concert as the Giambrone brothers or simply the brothers, and the Giambrones acting individually by their respective first names.

**[*3]** I.    *Rise and Fall*

In 1993 the Giambrone brothers started an independent mortgage business in the Chicago suburbs.  The brothers closed their first loan the next year, and their mortgage finance business prospered under their stewardship for nearly 30 years, including during the years relevant to this case.

A.    *Platinum Starts and Struggles*

Having won success in mortgage finance, the brothers set their sights on banking.  In 1998 they decided to start a federally chartered savings and loan institution (also called a thrift), focusing on real estate transactions with themselves as primary shareholders.  A federally chartered thrift had the advantage of being exempt from state licensing requirements although it came with required training and close scrutiny by the Office of Thrift Supervision (OTS).[3]

Holding was incorporated in Illinois in July 1998 as a domestic business corporation to serve as the holding company for Platinum, a subsidiary corporation.  Holding raised approximately $6,664,000 through its initial private placement, with the Giambrone brothers each purchasing $1.8 million worth of common stock shares and Michele purchasing another $25,000 worth of common stock shares.  The Giambrones did not relinquish their controlling interest in Holding (and thereby Platinum) until 2008.  During that time, the brothers served on the boards of directors of both companies, with William acting as chairman and CEO.

Platinum opened its doors for business on March 1, 1999.  According to OTS, it employed a traditional savings and loan business model, "gathering deposits from local communities and investing those funds in single-family mortgage loans from the same local communities."  Platinum's "initial residential mortgage lending business . . . consisted of purchasing closed loans" from the brothers' affiliated mortgage bank.  In mid-2001 Platinum added a line of business that involved purchasing residential loans, packaging them, and selling the packages in the secondary mortgage market.

_____

[3] OTS was a federal agency formed in 1989 as part of the U.S. Department of the Treasury.  The 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act disbanded OTS and transferred its functions to other federal agencies.  12 U.S.C. § 5413.

**[\*4]**   As William later observed, Platinum experienced "bumps in the road throughout."  Management and business strategy proved to be particular weaknesses.  In multiple examination reports OTS critiqued Platinum for failing, inter alia, to (1) implement proper reporting, (2) follow a coherent business strategy, and (3) develop adequate asset classification policies or a loan review process.

Platinum faced a consistent lack of profitability, which had ripple effects on capital adequacy.  Slow earnings had been anticipated as part of Platinum's startup phase, but through 2006 it had failed to turn a profit in any year.  OTS identified Platinum's secondary mortgage market line of business as the primary culprit, noting that it "ha[d] not been able to generate profits . . . since its inception, as the revenue generated from the spread between price paid for the loans and the price received at their sale could not cover the expenses of the operation."

Holding turned to capital raises to cushion Platinum's losses, which had consumed 71% of the original capital by 2003.  These capital raises depended in large part on the Giambrone brothers.  Each brother bought $1 million worth of newly issued shares in 2001, and then another $1.25 million worth of shares in 2002.  In 2004 Holding returned to the well, raising an additional $2.5 million from the brothers through the issuance of trust-preferred securities.

The bottom dropped out in 2007.  As OTS explained, in February of that year "a significant change occurred in the secondary mortgage market which impacted Platinum's business plan and the overall direction of the thrift."  The value of the loans that Platinum held for sale in the secondary market "declined sharply," which led to substantial losses and exposure for indemnification and repurchase of certain loans.

Despite closing the secondary mortgage market business in April 2007 (followed by selling its wholesale loan operation in June 2007), "Platinum recorded $300,000 in net losses during the months of July and August 2007."  These operating losses continued a downward trend from 2006 for the "core thrift [line of business], which had historically been profitable."  OTS concluded that the "core operation of the thrift does not appear to be structurally profitable."

**[\*5]**   B.   *Out of the Frying Pan*

      1.   *Platinum on the Market*

Faced with this bleak outlook, William began exploring the sale of Holding's stock or assets. To assist, he retained Hovde Financial, Inc. (Hovde), an investment banking firm, in June 2007. Over the summer Hovde prepared an offering memorandum, which it distributed in September to 34 interested parties.

Hovde was not the only source of potential buyers, however. In October 2007 William contacted Catherine Kissick, a senior vice president at Colonial Bank (Colonial), to try to sell some of Platinum's mortgage loans. Ms. Kissick, in turn, connected William with Mr. Farkas, the owner of Taylor, Bean & Whitaker Mortgage Corp. (TBW), a wholesale mortgage lending firm based in Ocala, Florida. What began as conversations about purchasing loans soon turned into serious talk about TBW's acquiring a controlling interest in Holding.

By the end of October, Holding had received a variety of offers. Patrick Theodora, a senior executive vice president at the brothers' independent mortgage business, executed a nonbinding term sheet proposing to invest $2 million for 80,000 shares of preferred stock in Holding. The African American Community Trust made a nonbinding preliminary offer of $6.9 to $7.1 million to acquire Platinum as a subsidiary of the trust. An English entity, Global Funding and Investment Consultancy, tendered a proposal to acquire Platinum in an all-cash acquisition of $12 million. Crusader Financial Group, Inc., an international financial services company based in New York, made an offer to invest between $4 and $7 million to take a 90% controlling interest in Holding.

For its part, TBW made a nonbinding offer to purchase $10 million of newly issued capital stock in Holding, which would give it a 60% stake in the company. The deal contemplated an immediate capital infusion of $3 million, with the remainder to be paid at closing. William saw the TBW offer as the most attractive, considering the other options as fallbacks to explore if the TBW deal did not go through.

      2.   *Increasing Pressure from OTS*

As William was searching for a match, OTS began taking a more active role, launching a detailed examination in July 2007. On September 26, 2007, OTS notified Platinum's board that it was in

[*6] "troubled condition" (as defined by 12 C.F.R. § 563.555). This designation came with a variety of restrictions and requirements from OTS. Although OTS noted that Platinum remained adequately capitalized, it cautioned that "this capital designation may not fully capture the high level of risk and uncertainty associated" with Platinum's held-for-sale loan portfolio.

Another examination that began in late October uncovered an increase in delinquent and nonperforming loans, which led OTS to conclude that Platinum had become "significantly undercapitalized." OTS accordingly issued a prompt corrective action letter on November 7, 2007, notifying Platinum of the downgrade to its capital status. The letter (1) required the submission of a capital restoration plan meeting assorted statutory and regulatory standards and (2) imposed restrictions set forth in 12 U.S.C. § 1831 and accompanying regulations.

### 3. *Consummation of Agreement*

William and Mr. Farkas, along with their respective advisors, spent the better part of November and December negotiating the terms of a TBW acquisition of Holding. As the principal regulator, OTS met Mr. Farkas in November and learned the contours of the deal in the required capital restoration plan Platinum submitted in December. William noted that if the TBW deal fell through, he was confident that he could obtain a capital infusion of $4 million through Mr. Theodora (and Mr. Theodora's father).

TBW and Holding ultimately entered into a stock purchase agreement on December 18, 2007, with TBW agreeing to purchase $10 million in newly issued Holding stock, which would give TBW a 75% controlling interest. Given the need for an immediate capital infusion into Platinum, the deal was structured to include a $4 million loan from TBW to William, which he used to buy newly issued Holding stock (providing funds that could be injected into Platinum). The parties agreed that William would transfer that stock to TBW at closing in satisfaction of the loan and, at the same time, that TBW would purchase an additional $6 million in newly issued stock in Holding.

Two days after the signing of the stock purchase agreement, OTS issued a cease-and-desist order against Platinum. OTS found that Platinum had "engaged in unsafe and unsound banking practices" pertaining to real estate lending standards, reevaluation of real estate, and timely and accurate filing of financial, operational, and regulatory

**[\*7]** reports. The order imposed multiple stringent requirements relating to asset quality and management practices.

In February 2008 OTS, at Platinum's behest, lifted the restrictions and requirements imposed by the prompt corrective action letter, as Platinum had become adequately capitalized. The same month, TBW submitted to OTS a change-in-control application and a proposed business plan for Platinum.

The business plan contemplated the integration of Holding and Platinum into the TBW retail mortgage lending operation, transitioning the business to providing "conventional conforming . . . and jumbo loan products to qualified borrowers." The plan explained that Platinum would "not fund the loan originations, but rather [would] receive fee income from the transactions" and that "[a]ll loan underwriting, closing, quality control, and secondary marketing operations [would] be conducted by TBW." The plan also anticipated "the establishment of escrow custodial deposit accounts for the TBW loan servicing operation," providing "a level of low-cost core deposits." The plan contemplated migrating escrow deposits of $5 million in December 2008 and another $5 million in June 2009.

The plan further specified that Platinum would "engage in secondary market/mortgage banking exclusively through TBW's [CommunityBanksOnline] program," which involved "over 2,200 community banks initiating secondary market/mortgage loans with no risk to the banks." The affiliate transaction was meant to "strengthen and enhance [Platinum's] performance and risk management profile . . . within the framework of the affiliate transaction limitations imposed by [OTS]." This would "allow [Platinum] to offer competitive retail mortgage loans to its customers while eliminating risks associated with originating secondary/market mortgage loans."

On June 24, 2008, OTS approved TBW's application to purchase a controlling interest in Holding, and closing took place in July 2008. Mr. Farkas became Holding's majority shareholder and was appointed chairman of Holding and Platinum, replacing William, who left the board. With the sale, the Giambrone brothers' stake in Holding dropped from 54% to approximately 14%.

C.   *Into the Fire*

Beginning in October 2008 Platinum began to implement the TBW business plan and address the weaknesses in its previous

[*8] incarnation. In an examination that began in late October 2008, OTS noted that Platinum continued to struggle with earnings and problem assets but stated that TBW had begun to reverse the losses through a number of measures that might "generate substantial fee income." Among other things, the examination showed that Platinum had received escrow deposits of $38.7 million by the end of October, which affected its capital ratio.

By March 2009 Platinum nonetheless had stabilized to the point that OTS terminated the cease-and-desist order that had been put in place at the end of 2007. Platinum also entered into a memorandum of understanding with OTS as to future operations. TBW also retained a team of outside advisors to prepare a revised business plan for Platinum, which listed additional servicing of escrow deposits as a source of contingency funding and was ultimately approved by Platinum's board. As of June 30, 2009, Platinum reported total assets of $148 million and received approval from the Federal Home Loan Mortgage Corporation (Freddie Mac) as an escrowee of custodian funds.

Matters changed rapidly in July. On July 2, 2009, Platinum purchased $198 million in TBW loans, using escrow deposits transferred from TBW. These escrow deposits related to mortgage loans owned by Freddie Mac and serviced by TBW.

This massive purchase set off alarms at OTS, which launched an investigation on July 13, 2009. While OTS was ramping up its investigation, Platinum received $210 million in additional Freddie Mac escrow deposits in July, which it used to purchase $292 million more in TBW loans. By the time OTS issued a letter on July 31, 2009, directing Platinum to "cease all further purchases of TBW loans," Platinum had purchased approximately $480 million in TBW loans.

On August 3, 2009, OTS issued a letter notifying Platinum that it was in troubled condition, and two days letter OTS transmitted an examination report downgrading Platinum's rating "to reflect the high probability of failure." Although OTS directed TBW to repurchase the loans, TBW replied that it lacked the resources to do so.

It was a complicated time for TBW. Deloitte had suspended a financial examination after discovering certain irregular transactions that raised concerns of fraud, and TBW faced both a search warrant and an SEC subpoena relating to its dealings with Colonial BancGroup, Colonial's parent company. Around the same time, the Federal Housing

[*9] Association suspended TBW, preventing it from originating and underwriting new FHA-insured mortgages, and Freddie Mac suspended TBW as an approved originator of its loans. TBW filed for bankruptcy on August 24, 2009.

On September 1, 2009, Freddie Mac directed Platinum to transfer $210 million in escrow deposits to another depository institution within seven days. Platinum had insufficient liquidity and was unable to sell the loans that it had purchased from TBW. On September 4, 2009, OTS closed Platinum and placed it into receivership with the Federal Deposit Insurance Corporation (FDIC). A report prepared by the Office of Inspector General of the Department of the Treasury identified Platinum's "unsafe and unsound affiliate transactions with [TBW] in July 2009" as the principal reason for its failure (while also critiquing OTS for inadequate supervision).

II. *Criminal Proceeding Against Mr. Farkas*

In June 2010 Mr. Farkas was indicted in the U.S. District Court for the Eastern District of Virginia on 16 counts of conspiracy and bank, wire, and securities fraud. After the Government withdrew two counts of wire fraud, a jury convicted Mr. Farkas on the 14 remaining counts, and he was sentenced to 30 years in prison.

As explained by the United States in its posttrial restitution position paper, from 2002 through 2009 Mr. Farkas "orchestrated a fraud of immense size," "defraud[ing] banks of more than $3.5 billion and misl[eading] shareholders of Colonial Bancgroup." The Government summarized the long-running fraud as having five basic elements: (1) a $140 million "sweeping scheme [during 2002 and 2003] to hide overdrafts in TBW bank accounts held at Colonial[;]" (2) a $250 million new phase ("Plan B") in which Mr. Farkas and his co-conspirators "caused the deficit covered up by the sweeping scheme to be moved" by means of TBW's "fake sales of mortgage assets to Colonial[;]" (3) a variation on Plan B in which "conspirators engaged in fake sales of pools of loans to Colonial Bank, and in return TBW received over $1.3 billion from Colonial from mid-2005 through mid-2008[;]" (4) a scheme that involved defrauding Deutsche Bank and BNP Paribas, which held a combined $1.7 billion in worthless commercial paper in a TBW subsidiary whose assets had been "stripped out and used to pay other TBW expenses[;]" and (5) a variety of fraudulent representations in connection with an application filed by Colonial BancGroup in 2008 as part of the Troubled Asset Relief Program. The Government did not

**[*10]** assert (in the indictment, at trial, or in its posttrial papers) that Mr. Farkas committed fraud on Platinum, Holding, or the Giambrones.

After Mr. Farkas was convicted, the court proceeded to the issues of forfeiture and restitution. On June 30, 2011, the district court entered a preliminary forfeiture order requiring Mr. Farkas to forfeit $38,541,210, specifying certain properties that would be forfeited as a substitute for unavailable proceeds of the offenses.

The United States further argued for restitution exceeding $3.5 billion, to be directed pro rata to victims including the FDIC, Deutsche Bank, BNP Paribas, and Colonial Bancgroup shareholders. At the restitution hearing, the district court observed that "this hearing is a bit of form over substance, because the reality of it is none of these defendants will ever be able to come close to paying anything close to the numbers involved here." Mr. Farkas's counsel expressed a similar view, noting that "considering the sentence imposed upon him and his age, the probability of him making any significant contribution toward that payment . . . is practically nil." The district court later returned to the theme, stating that "other than what's obtained through forfeiture and the financial responsibility program of the Bureau of Prisons, [there is] little likelihood that much else will be obtained from him."

On September 26, 2011, the district court issued a restitution judgment, ordering Mr. Farkas to pay more than $3.5 billion to 20 specified victims. The Giambrones, Platinum, and Holding were not named as victims.

III.   *The Giambrones' Theft Loss Deductions and the IRS Examination*

The Giambrones claimed theft loss deductions of 95% of the value of their investments in Platinum on their timely filed 2012 federal income tax returns. Michael claimed a deduction of $3,842,926, which he carried over to his 2013, 2014, and 2015 tax years, and William and Michele claimed a deduction of $3,866,676, which they carried over to their 2014 and 2015 tax years.[4] The Giambrones premised their claimed deductions on Rev. Proc. 2009-20, § 1, 2009-14 I.R.B. 749, 749, which provides "an optional safe harbor treatment for taxpayers that

---

[4] The net operating loss adjustment for William and Michele Giambrone's tax year 2013 did not result in a deficiency.

**[*11]** experienced losses in certain investment arrangements discovered to be criminally fraudulent."[5]

In March 2018 the IRS issued notices of deficiency that disallowed each of the claimed theft loss deductions on the ground that the Giambrones had failed to establish their entitlements to the deductions. Against Michael, the IRS determined deficiencies of $842,554, $80,763, $204,716, and $385,210 for tax years 2012 through 2015, respectively, as well as accuracy-related penalties totaling $302,649. Against William and Michele, the IRS determined deficiencies of $840,499, $272,304, and $340,205 for tax years 2012, 2014, and 2015, respectively, as well as accuracy-related penalties totaling $290,602.

OPINION

I.     *Burden of Proof*

Generally, the Commissioner's determinations are presumed correct, and taxpayers bear the burden of proving the determinations erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Under section 7491(a), if a taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability and meets other requirements, the burden of proof shifts from the taxpayer to the Commissioner as to that factual issue. The Giambrones do not contend, and the evidence does not establish, that the burden of proof should shift to the Commissioner as to any issue of fact, and so it remains with them. *See* I.R.C. § 7491(a)(1).

II.     *Analysis*

A.     *Theft Loss*

The Code allows taxpayers to deduct losses arising from theft that are sustained during the taxable year and not compensated by insurance or otherwise. *See* I.R.C. § 165(a), (c)(3). To establish a theft loss, a taxpayer must first prove the occurrence of a theft under the law of the relevant jurisdiction. *See, e.g.*, *Monteleone v. Commissioner*, 34 T.C. 688, 692 (1960) ("For tax purposes, whether a theft loss has been sustained depends upon the law of the jurisdiction wherein the particular loss

---

[5] We previously granted summary judgment to the Commissioner on this point, concluding that the Giabmrones did not fit within this safe harbor. Our ruling did not reach the question of whether the Giambrones are entitled to the claimed theft loss deductions, which we now answer.

[*12] occurred."); *Torres v. Commissioner*, T.C. Memo. 2021-66, at *6. "The taxpayer must then establish the amount of the loss and the year in which the loss was sustained." *Bruno v. Commissioner*, T.C. Memo. 2020-156, at *15; *see also* Treas. Reg. § 1.165-1(c)(1), (d)(1). "Normally, a loss will be regarded as arising from theft only if there is a criminal element to the appropriation of the taxpayer's property." *Vennes v. Commissioner*, T.C. Memo. 2021-93, at *29 (citing *Edwards v. Bromberg*, 232 F.2d 107, 110 (5th Cir. 1956)); *see also Littlejohn v. Commissioner*, T.C. Memo. 2020-42, at *26 ("As used in section 165, the term 'theft' is a word of general and broad connotation, intended to cover any criminal appropriation of another's property . . . .").

### 1. *Occurrence of a "Theft"*

A taxpayer must prove by a preponderance of the evidence that an actual theft occurred. *See, e.g.*, *Bruno*, T.C. Memo. 2020-156, at *15–16; *Enis v. Commissioner*, T.C. Memo. 2017-222, at *18. The parties agree that we look to Illinois state law to make this determination. The Giambrones assert that they suffered a theft of their controlling interest in Holding under 720 Ill. Comp. Stat. Ann. 5/16-1(a)(2) (West 2006).

The relevant Illinois statute provides that a "person commits theft when he knowingly . . . [o]btains by deception control over property of the owner." *Id.* The term "deception" is defined to mean, inter alia, "knowingly to: (a) [c]reate or confirm another's impression which is false and which the offender does not believe to be true; or (b) [f]ail to correct a false impression which the offender previously has created or confirmed." *Id.* 5/15-4(a) and (b) (West 1962). Theft by deception requires the State to prove four elements: (1) the victim was induced to part with property; (2) the transfer of the property was based on deception; (3) the accused intended to permanently deprive the victim of the property; and (4) the accused acted with specific intent to defraud the victim. *See, e.g.*, *People v. Kotlarz*, 738 N.E.2d 906, 919 (Ill. 2000).

In these cases, TBW acquired a controlling interest in Holding by purchasing $10 million worth of newly issued shares. Relying on Illinois' expansive definition of property as "anything of value," 720 Ill. Comp. Stat. Ann. 5/15-1 (West 1994), the Giambrones assert that they suffered a theft by deception of their controlling interest in Holding based on various representations by (or about) Mr. Farkas.

We begin by questioning whether the Giambrones are the proper parties to claim any deduction. To put it simply, the Giambrones did

**[\*13]** not sell anything to Mr. Farkas. Rather, Holding sold shares to TBW as part of a negotiated transaction according to which it received $10 million in compensation.[6] To the extent that there was any sort of fraudulent inducement in the 2008 transaction, it would seem directed at Holding, not the Giambrones, and any theft loss deduction would belong to it. *See Grothues v. Commissioner*, T.C. Memo. 2002-287, 2002 WL 31662269, at \*6–8 (disallowing theft loss deduction claimed by sole shareholder for embezzlement suffered by corporation); *see also Malik v. Commissioner*, T.C. Memo. 1995-204, 1995 WL 273982, at \*3 (disallowing theft loss deduction for certain funds lent to club that subsequently suffered embezzlement).

The Giambrones try to sidestep this issue by asserting that they suffered a loss of their controlling interest in Holding. We have significant reservations about the underlying premise that a controlling interest in a company is itself property independent of the shares that give such control. We begin mindful of the admonition that federal courts have "limited discretion . . . with respect to untested legal theories brought under the rubric of state law." *A.W. Huss Co. v. Cont'l Cas. Co.*, 735 F.2d 246, 253 (7th Cir. 1984).

This is one such theory. Although control is certainly valuable, the Giambrones have failed to point us to any Illinois law (and we have not found any) suggesting that a controlling interest in a company can be considered property in a vacuum, divorced from the shares undergirding it. To the contrary, control stems from assembling enough shares to direct a company's affairs, and the value of a controlling interest, i.e., the control premium,[7] is impounded into the value of shares sufficient to obtain such an interest. *See, e.g.*, *Philip Morris Inc. & Consol. Subs. v. Commissioner*, 96 T.C. 606, 628, 630 (1991) (finding that a control premium was "a substantial portion of the [share] price" and that a shareholder's "voting power" is "inherent in each share" through a control premium"), *aff'd*, 970 F.2d 897 (2d Cir. 1992) (unpublished table decision); *Nestle Holdings, Inc. v. Commissioner*, T.C. Memo. 1995-441, 1995 WL 544886, at \*61 (finding that a control

---

[6] The Giambrones do not argue that we should attach any significance to the structure of the transaction, i.e., the loan to William of $4 million for the purchase of newly issued shares, which were ultimately turned over to TBW in satisfaction of that loan as part of the 2008 closing.

[7] "A control premium represents the additional value associated with the shareholder's ability to control the corporation by dictating its policies, procedures, or operations." *Estate of Mitchell v. Commissioner*, T.C. Memo. 2002-98, 2002 WL 531148, at \*7.

[*14] premium was "inherent" in the share price), *aff'd in part, rev'd in part on another issue*, 152 F.3d 83 (2d Cir. 1998).  Control qua control is not property separate from the shares that confer such authority.

The Giambrones nonetheless urge us to conclude that a controlling interest is a thing of value according to the Illinois Supreme Court's decision in *People v. Perry*, 864 N.E.2d 196, 207 (Ill. 2007), which held that "use of a hotel room" was a thing of value that could be the subject of theft by deception.  In reaching its conclusion, the Illinois Supreme Court emphasized that the "hospitality industry provides lodging to the public for profit" and the "market for hotel and motel rooms is vast." *Id.*  Control over a hotel room for a night is markedly different from a controlling interest in a company in that there is a direct market for the former and an indirect one in the latter, conducted through the buying and selling of shares.  We see no indication that the Illinois Supreme Court meant for its ruling regarding hotel rooms to upend corporate law.

Moreover, we are not persuaded that the transfer of the controlling interest in Holding was based on deception by Mr. Farkas.  With respect to this point, the Illinois Supreme Court has explained that "reliance by the victim on the defendant's deceptive conduct must be proved." *People v. Davis*, 491 N.E.2d 1153, 1155 (Ill. 1986); *see also People v. Kaye*, 507 N.E.2d 12, 18 (Ill. App. Ct. 1987).  The Giambrones essentially argue that Mr. Farkas knowingly created and confirmed in their minds the false impression that he was a legitimate businessman and that, but for that false impression, they would not have sold their controlling interest to him.  Taking for granted that Mr. Farkas fostered a false impression of himself as a respectable member of the business community, the evidence before us nonetheless shows that the deal occurred because of Platinum's rapidly deteriorating financial situation, the attractive terms offered by TBW, and OTS pressure.  Although the image that Mr. Farkas promoted might have been the cherry-on-top from the Giambrones' perspective, it did not cause the transfer of the controlling interest in Holding.

Finally, the Giambrones have not shown that Mr. Farkas acted with a specific intent to defraud them.  Although Mr. Farkas was in the midst of a historic fraud when he obtained the controlling interest in Holding, he cheated Colonial, Deutsche Bank, BNP Paribas, and assorted governmental entities, not the Giambrones.  The United States never identified the Giambrones, Holding, or Platinum as victims of Mr. Farkas's nefarious plots, and we see no indication that they were.  TBW

**[\*15]** paid $10 million to acquire a 75% controlling stake in Holding and spent millions more to resurrect Platinum. Although Mr. Farkas no doubt was a fraudster, the Giambrones have not established that he knowingly intended to defraud them when he used TBW to purchase a controlling interest in Holding.[8]

### 2. *Year in Which Sustained*

Even if a theft occurred under Illinois law, the Giambrones did not prove that they claimed the deductions for the correct tax year, a fatal flaw. *See, e.g.*, *Premji v. Commissioner*, T.C. Memo. 1996-304, 1996 WL 370999, at \*7, *aff'd*, 139 F.3d 912 (10th Cir. 1998) (unpublished table decision); *see also* Treas. Reg. § 1.165-1(d)(1). Generally, a theft loss is "sustained during the taxable year in which the taxpayer discovers such loss." I.R.C. § 165(e).

A deductible loss must be actual and sustained in fact, and thus a theft loss "must be evidenced by a closed and completed transaction." *Premji v. Commissioner*, 1996 WL 370999, at \*8; *see also* Treas. Reg. § 1.165-1(d)(1). "If in the year of discovery, the taxpayer has a 'reasonable prospect of recovery' on a claim for reimbursement, the loss will not be sustained until 'the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received.'" *Torres*, T.C. Memo. 2021-66, at \*9 (quoting Treas. Reg. § 1.165-1(d)(3)).

Whether a reasonable prospect of recovery exists "is a question of fact to be determined upon an examination of all facts and circumstances." Treas. Reg. § 1.165-1(d)(2)(i); *see also McNely v. Commissioner*, T.C. Memo. 2019-39, at \*8. "A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor." *Ramsay*

---

[8] The Giambrones seek to bolster their contention that they were victims of Mr. Farkas's fraud by pointing to the July 2009 escrow transactions involving Holding. In the Giambrones' view, they lost their controlling interest in Holding through a theft by deception in 2008, but it was not until 2009 that Mr. Farkas took purportedly unauthorized actions involving the purchase of TBW loans using escrow deposits Platinum received. The Giambrones relinquished their controlling interest in Holding in 2008, however, and the fact that they did not authorize actions taken afterwards is neither here nor there. Even if we were to entertain the Giambrones' argument, we return to the principle that only the state-law owner of the stolen property would be entitled to the theft loss deduction, which would be Holding, not the Giambrones. *See Malik v. Commissioner*, 1995 WL 273982, at \*3.

[*16] *Scarlett & Co. v. Commissioner*, 61 T.C. 795, 811 (1974), *aff'd*, 521 F.2d 786 (4th Cir. 1975). "The situation is not to be viewed through the eyes of the 'incorrigible optimist,'" *id.*, and thus the "loss deduction need not be postponed if the potential for success of a claim is remote or nebulous," *Vennes*, T.C. Memo. 2021-93, at *33. "[W]here the financial condition of the person against whom a claim is filed is such that no actual recovery could realistically be expected, the loss deduction need not be postponed." *Jeppsen v. Commissioner*, T.C. Memo. 1995-342, 1995 WL 440435, at *4, *aff'd*, 128 F.3d 1410 (10th Cir. 1997).

"The determination as to whether there is a reasonable prospect of recovery is based primarily on objective factors; the taxpayer's subjective belief may also be considered, but it is not the sole or controlling criterion." *Vennes*, T.C. Memo. 2021-93, at *34; *see also Ramsay Scarlett*, 61 T.C. at 811. Some of the objective factors we consult include (1) the probability of recovery, (2) the status of the claim, and (3) the availability of civil or criminal restitution. *See, e.g., Vennes*, T.C. Memo. 2021-93, at *34; *Torres*, T.C. Memo. 2021-66, at *9 ("A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor." (quoting *Ramsay Scarlett*, 61 T.C. at 811)); *Urtis v. Commissioner*, T.C. Memo. 2013-66, at *16. As part of this inquiry, "courts may consider claims not actually filed or pursued by a taxpayer." *Vennes*, T.C. Memo. 2021-93, at *34; *see also Urtis*, T.C. Memo. 2013-66, at *16.

The Giambrones assert that they correctly reported the theft loss for 2012 because, until that year they had a reasonable prospect of recovery either from Mr. Farkas or from the assets of Holding and Platinum that were subject to FDIC receivership.

We first conclude that the Giambrones had no reasonable prospect of recovery from Mr. Farkas after 2011. On September 26, 2011, the U.S. District Court for the Eastern District of Virginia entered a restitution judgment of $3.5 billion against Mr. Farkas in favor of 20 identified victims. This judgment followed on the heels of an order directing Mr. Farkas to forfeit $38,541,210 in property (as a stand-in for the proceeds of the offense). The Giambrones were not named as victims, and they filed no claims as part of these proceedings. Given these staggering amounts (which far exceeded Mr. Farkas's net worth), there was no reasonable possibility of recovery from Mr. Farkas after 2011, a point underscored by both the district court and Mr. Farkas's counsel during the 2011 restitution hearing. *See Jeppsen v.*

**[\*17]** *Commissioner*, 1995 WL 440435, at \*4 (concluding that the deduction "need not be postponed" where financial obligations of the person against whom the claim is made outstrip his ability to pay).

Nor are we persuaded that the Giambrones had a reasonable prospect of recovery from the assets of Platinum and Holding that were subject to the FDIC receivership. William testified that he believed that he might recover, based on his shares in Holding, until 2012, when he began discussions with the FDIC about the settlement of claims related to loans from 2004.

The Giambrones fail to establish the claim or theory that would entitle them to recoup the value of their controlling interest allegedly stolen by Mr. Farkas from the assets remaining to Platinum and Holding. Furthermore, the Giambrones do not explain why settlement discussions with the FDIC regarding 2004 loans would lead them to believe they no longer had a reasonable prospect of recovery. The Giambrones have shown, at best, a nebulous and speculative hope that they could obtain some of the assets of Platinum and Holding in compensation for the theft they believed that they had suffered. This vague and subjective belief falls far short of establishing that they had a reasonable prospect of recovery from the assets of Platinum or Holding at any point.

### 3. *Conclusion*

In summary, the Giambrones have not shown the existence of a theft, and even if they had, they have failed to establish that they deducted the loss resulting from any such theft for the proper year. They are therefore not entitled to the theft loss deductions claimed on their respective 2012 returns.[9]

### B. *Accuracy-Related Penalties*

In each of the notices of deficiency, the Commissioner determined a 20% accuracy-related penalty against the Giambrones, premised on an underpayment attributable to negligence and a substantial understatement of income tax. *See* I.R.C. § 6662(a) and (b)(1) and (2). Section 7491(c) generally provides that "the Secretary shall have the

---

[9] Because we have determined that the Giambrones have not established their entitlement to theft loss deductions without the need of the parties' respective experts, we will deny as moot the Commissioner's motion in limine to strike portions and limit the use of the rebuttal report of Mark S. Gottlieb.

**[\*18]** burden of production in any court proceeding with respect to the liability of any individual for any penalty." This burden requires the Commissioner to come forward with sufficient evidence indicating that the imposition of the penalty is appropriate. *See Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). Once he meets his burden of production, the burden of proof is on the taxpayer to "come forward with evidence sufficient to persuade a Court that the Commissioner's determination is incorrect." *Id.* at 447.[10]

The Code imposes a 20% penalty on the portion of the underpayment of tax attributable to a substantial understatement of income tax.[11] *See* I.R.C. § 6662(a), (b)(2). An understatement of income tax is substantial if it exceeds the greater of $5,000 or "10 percent of the tax required to be shown on the return." I.R.C. § 6662(d)(1)(A). The Commissioner has met his prima facie burden, as each of the understatements at issue plainly exceeds $5,000 and is greater than 10% of the tax required to be shown on the relevant returns as follows:

| Petitioner(s) | Year | Reported Tax Liability | Corrected Tax Liability | Understatement |
|---|---|---|---|---|
| Michael Giambrone | 2012 | -0- | $842,554 | $842,554 |
| Michael Giambrone | 2013 | $3,330 | 84,093 | 80,763 |
| Michael Giambrone | 2014 | 6,577 | 211,293 | 204,716 |
| Michael Giambrone | 2015 | 468,419 | 853,629 | 385,210 |
| William and Michele Giambrone | 2012 | -0- | 836,499 | 840,499[12] |

---

[10] The parties have stipulated that the Commissioner complied with the written supervisory approval requirement of section 6751(b)(1) with respect to all penalties.

[11] "Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one of the grounds set forth in section 6662(b)." *Sampson v. Commissioner*, T.C. Memo. 2013-212, at \*7–8 (citing *New Phx. Sunrise Corp. v. Commissioner*, 132 T.C. 161, 187 (2009), *aff'd*, 408 F. App'x 908 (6th Cir. 2010)). Consequently, we will not determine whether the Giambrones are liable for penalties for negligence.

[12] According to William and Michele's notice of deficiency, the total corrected tax liability for 2012 included a decrease in the additional child tax credit of $4,000.

| | | | | |
|---|---|---|---|---|
| **[*19]** William and Michele Giambrone | 2014 | 3,598 | 272,244 | 272,304[13] |
| William and Michele Giambrone | 2015 | 504,152 | 844,357 | 340,205 |

Accuracy-related penalties do not apply to any part of an underpayment of tax if it is shown that the taxpayer acted with reasonable cause and in good faith with respect to that portion. I.R.C. § 6664(c)(1); *Rogers v. Commissioner*, T.C. Memo. 2019-61, at *31, *aff'd*, 9 F.4th 576 (7th Cir. 2021). Although the Giambrones signaled in their petitions their intent to argue reasonable cause, they failed to do so in the opening briefs and thus have conceded the issue. *See, e.g.*, *Ashkouri v. Commissioner*, T.C. Memo. 2019-95, at *24 n.9 ("Having conceded an issue by failing to advance a meaningful argument on that issue in their opening brief, [the taxpayers] could not withdraw that concession by belatedly including a cognizable argument in their reply brief."); *see also Campos v. Cook County*, 932 F.3d 972, 976 n.2 (7th Cir. 2019) ("Parties waive arguments which they develop for the first time in a reply brief.").[14]

---

[13] According to William and Michele's notice of deficiency, the total corrected tax liability for 2014 included a decrease in the additional tax credit of $3,658.

[14] Even if we were to ignore the Giambrones' concession, they failed to show that they qualified for the reasonable cause exception embodied in section 6664(c)(1). In their reply brief, the Giambrones assert that they relied on advice provided by Kenneth Kolnicki, William's accountant, in claiming the theft loss deduction. If a taxpayer alleges reliance on the advice of an accountant, return preparer, or other tax professional, the taxpayer must show that he "actually relied in good faith on the professional's advice." *Schweizer v. Commissioner*, T.C. Memo. 2022-102, at *7 (quoting *Crimi v. Commissioner*, T.C. Memo. 2013-51, at *99); *see also Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98–99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002); Treas. Reg. § 1.6664-4(c)(1) (requiring that the taxpayer must have "reasonably relied in good faith on [the] advice"). For these purposes, advice includes any communication setting forth an analysis or conclusion provided to or for the benefit of the taxpayer. *Schweizer*, T.C. Memo. 2022-102, at *8. Simply preparing a return based on data provided by a taxpayer does not count as advice. *Id.* The testimony at trial (both from William and Mr. Kolnicki) does not establish that Mr. Kolnicki provided any analysis or conclusions regarding the theft loss deduction, and the Giambrones thus have not shown reasonable reliance.

**[\*20]** III.  *Conclusion*

We uphold the determinations in the notices of deficiency to disallow the theft loss deductions the Giambrones claimed on their respective 2012 tax returns.  We also conclude the Giambrones are liable for penalties under section 6662(a).

To reflect the foregoing,

*Decisions will be entered for respondent.*